634 So.2d 466 (1994)
BELLE PASS TERMINAL, INC. and Harold J. Callais
v.
JOLIN, INC., and Joseph E. Blanchard, Jr.
JOLIN, Inc.
v.
BELLE PASS TERMINAL, INC., Richard P. Guidry, Individually, Elmo J. Pitre, Jr., Individually, Harold J. Callais, Individually.
Nos. 92 CA 1544, 92 CA 1545.
Court of Appeal of Louisiana, First Circuit.
March 11, 1994.
*471 Michael A. Mayhall, New Orleans, for Belle Pass Terminal, Inc. and Richard P. Guidry.
Peter Feringa, John Olinde and Christoffer Friend, New Orleans, for Jolin, Inc. and Joseph E. Blanchard, Jr.
Alvin J. Bordelon, New Orleans, for Harold Callais.
Frank G. DeSalvo, Venus Masakowski, New Orleans, for Elmo Pitre, Jr.
Stephen E. Caillouet, Thibodaux, for Caillouet Land Co.
Before CARTER, GONZALES and WHIPPLE, JJ.
CARTER, Judge.
This appeal arises out of a trial court judgment in a suit for breach of warranty, redhibition, and damages, which was consolidated with a suit on a promissory note.

BACKGROUND
On or about April 30, 1973, Caillouet Land Corporation (Caillouet) entered into a lease with Joseph E. Blanchard, Jr. (Blanchard) *472 for a 7.5-acre tract of land on Pass Fourchon of Bayou Lafourche in Lafourche Parish. Thereafter, Blanchard assigned the lease to Fourchon Docks, Inc., a corporation in which Blanchard owned a substantial interest. On September 26, 1977, Caillouet entered into another lease agreement with Blanchard for an 8-acre tract of land on Pass Fourchon, which tract was adjacent to the tract covered by the 1973 lease. Thereafter, Blanchard assigned the lease to the Fourchon Docks, Inc. On December 30, 1981, the 1973 and 1977 leases were amended. The amended leases prohibited the sublease, sale, transfer, or assignment of the leases, in whole or in part, without the written consent of Caillouet. Subsequently, Fourchon Docks, Inc. formally changed its name to Jolin, Inc. (Jolin).

FACTS
On or about April 6, 1989, Belle Pass Terminal, Inc. (Belle Pass) entered into a "Sale and Mortgage" with Jolin. The sale and mortgage provided that Belle Pass purchased the following described property:
Any and all assets and improvements located on properties owned, leased, or rented by Jolin, Inc., Fourchon Docks, Inc. and Joe Blanchard in Fourchon, Louisiana.
The sale and mortgage also contained the following language:
Belle Pass Terminal, Inc. in this Bill of Sale purchases any and all lease rights that Jolin, Inc., Fourchon Docks, Inc. and Joseph E. Blanchard, Jr. may have on the property in Fourchon, Louisiana. Additionally, Belle Pass Terminal, Inc. agrees to abide by, honor, the aforesaid leases.
In consideration for these assets and improvements, Belle Pass executed a promissory note for $2 million with interest at a rate of 13%, payable in 120 monthly installments of $29,862.20. The note payments were due on the 15th day of each month, commencing May 15, 1989. The parties further agreed that, in the event Belle Pass prepaid the loan, the balance of the final payment would be $3,583,464.00, less the monthly installments already paid to Jolin on the principal and interest. Belle Pass also agreed to provide insurance coverage on the property in an amount not less than $2 million. The sale and mortgage and note were signed by Richard P. Guidry (Guidry), as president of Belle Pass. The note was personally guaranteed by Guidry and Elmo J. Pitre, Jr. (Pitre).
On that same day, Harold J. Callais (Callais) purchased from Jolin certain movable property for $1 million. Contemporaneously with the execution of the sale of the movable property, sale and mortgage, and note, Jolin, Fourchon Docks, Inc., Blanchard, Belle Pass, Guidry, individually and as president of Belle Pass, and Pitre, individually and as vice-president of Belle Pass, executed a "To Whom It May Concern" letter. In the letter, the parties acknowledged that Milchem Incorporated and/or Milpark (Milchem), to whom a portion of the property had been subleased, was prepaid on its lease through May 1, 1992,[1] and that once the prepayment period had run and rental payments resumed, those payments would be applied to the monthly mortgage payments due by Belle Pass, Guidry, and Pitre. The "To Whom It May Concern" letter also contained the following language:
Once the note is paid in full, all leases presently held by Jolin, Inc., Fourchon Docks, Inc., and Joseph E. Blanchard, Jr., in effect as of this date are to be transferred to Belle Pass Terminal, Inc., Richard P. Guidry, and Elmo P. Pitre, Jr.
The "To Whom It May Concern" letter also provided that Belle Pass, Guidry, and Pitre would be responsible for the lease payments to Caillouet according to the terms of the lease, but that the $6,700.00 in monthly rental would be paid to Jolin, which would in turn send a check for the rent to Caillouet.
Thereafter, the parties encountered some difficulties involving the required insurance coverage and the tardiness of the rental payments to Blanchard.[2] On April 5, 1990, Belle *473 Pass and Callais filed a suit for breach of warranty, redhibition, and damages against Blanchard and Jolin arising out of the sale of movable property and the purported sale and mortgage of the leases under docket number 65,847. In response thereto, Jolin and Blanchard filed numerous exceptions pleading the objections of lack of procedural capacity, prematurity, and nonjoinder of indispensable parties. After a hearing, the trial judge denied the exceptions pleading the objections of lack of procedural capacity and prematurity, but sustained the objection of nonjoinder of an indispensable party. Accordingly, the court ordered Belle Pass and Callais to join Guidry and Pitre as additional plaintiffs in the action.
On November 14, 1990, Belle Pass and Callais filed a supplemental petition to name Guidry and Pitre as plaintiffs. Guidry appeared in the petition and assumed the status of co-plaintiff with Belle Pass and Callais. Pitre retained his own counsel, but refused to assume the status of co-plaintiff. Thereafter, on February 1, 1991, Pitre filed a supplemental and amending petition, appearing and assuming the status as co-plaintiff with Belle Pass, Callais, and Guidry.
Jolin and Blanchard answered the petitions, generally denying any liability to Belle Pass, Callais, Guidry, and Pitre. In the answer, Jolin and Blanchard alleged that no payments on the $2 million note had been received since March 15, 1990, and requested a credit for the value received by Belle Pass, Callais, Guidry, and Pitre, in the event the court granted the relief requested in the main demand. Jolin and Blanchard also alleged that Guidry, Pitre, and Callais were personally liable for the debts in that these individuals were the alter ego of Belle Pass. Jolin and Blanchard also incorporated a reconventional demand in the answer, naming as defendants-in-reconvention Belle Pass, Guidry, Pitre and Callais. In the reconventional demand, Jolin and Blanchard alleged reformation of the contract,[3] tortious interference with a contract and unfair trade practices,[4] and personal liability on the part of the Belle Pass shareholders. Thereafter, the parties filed numerous exceptions, motions for summary judgment, and other pretrial motions.[5]
On January 22, 1991, Jolin filed a suit on a promissory note under docket number 67,730. Named as defendants in this action were Belle Pass, Guidry, Pitre, and Callais. In the petition, Jolin requested recognition of its mortgage and vendor's lien upon the property described in the April 6, 1989, act of sale and mortgage and for the issuance of a writ of sequestration, seizing all of the property designated in the sale and mortgage.[6] *474 Thereafter, various exceptions and pre-trial motions were filed by the parties.
Pursuant to a motion and order to consolidate, on June 27, 1991, the suit on the note filed by Jolin, under docket number 67,730, was consolidated with the suit for breach of warranty, redhibition, and damages filed by Belle Pass, Callais, Guidry, and Pitre, under docket number 65,847.
The matter was tried by a jury in late January and early February of 1992. After the close of Callais' case for rescission of the sale of the movables, the trial court granted Jolin's and Blanchard's motion for directed verdict, and Callais' claims against them were dismissed. On February 3, 1992, the jury rendered its verdict on the merits of both the action for breach of warranty, redhibition, and damages and the action on the promissory note. The jury's verdict was as follows:
1. Did Jolin, Inc. and Joseph Blanchard, Jr. sell the leases from Caillouet Land Corporation to Belle Pass Terminal, Inc., Richard Guidry, and Elmo Pitre, Jr. on April 6, 1989?
YES ___ NO _x_
[If your answer is "YES", go to Question # 2; If your answer is "NO", go to Question #6.]
2. Did the Caillouet Land Corporation leases to Jolin, Inc. and Joseph Blanchard, Jr., in effect on April 6, 1989, require Caillouet's written consent to the sale, transfer, or assignment of the leases by Jolin, Inc. and Joseph Blanchard, Jr.?
YES ___ NO ___
[If your answer is "YES", go to Question #3; If your answer is "NO", go to Question #6.]
3. Did the Caillouet Land Corporation give written consent to the sale, transfer, or assignment of the leases to Belle Pass Terminal, Inc., Richard Guidry, and Elmo Pitre, Jr.?
YES ___ NO ___
[If your answer is "YES", go to Question # 6; If your answer is "NO", go to Question #4.]
4. Did the failure of Caillouet Land Corporation to consent to the sale or transfer of the leases constitute a breach of Jolin, Inc.'s and Joseph Blanchard, Jr.'s warranty of peaceful possession, entitling Belle Pass Terminal, Inc., Richard Guidry, and Elmo Pitre, Jr. to cancel the sale, to have a return of the purchase price, and to be entitled to recover damages?
YES ___ NO ___
[If your answer is "YES", go to Question # 5; If your answer is "NO", go to Question # 6.]
5. What damages, if any, are Belle Pass Terminal, Inc., Richard Guidry, and Elmo Pitre, Jr. entitled to for the breach of warranty mentioned in Question #4 above? $ _____________ GO TO QUESTION # 6.
6. Did Harold Callais purchase the movables because he relied on the representations of Joseph Blanchard, Jr. that the Caillouets had consented to the sale of the leases and that Belle Pass could operate the business without interference.
YES ___ NO _x_
a. If your answer is YES to this question, was Harold Callais reasonable in relying on the representations of Joseph Blanchard, Jr.?
YES ___ NO ___
b. If your answer is YES, what damages, if any, is Harold Callais entitled to recover from Joseph Blanchard, Jr. and Jolin, Inc. as a result of the failure of Joseph Blanchard, Jr. to obtain the consent of the Caillouets to sell the leases?
c. $ ________________ GO TO QUESTION # 7.
7. Was the bulkhead sold by Jolin, Inc. and Joseph Blanchard, Jr. in the sale of April 6, 1989, to Belle Pass Terminal, Inc., Richard Guidry, and Elmo Pitre, Jr. defective on the date of the sale?
YES ___ NO _x_
[If your answer is "YES", go to Question # 8; If your answer is "NO", go to Question # 14.]
8. Did the defects make the bulkhead so unfit for its intended use that it must be presumed that the buyers, had they known of these defects, would not have purchased this property?
YES ___ NO ___
*475 [If your answer is "YES", go to Question # 9; If your answer is "NO", go to Question # 14.]
9. Did the buyers know of these defects before the sale or could these defects have been discovered by simple inspection?
YES ___ NO ___
[If your answer is "YES", go to Question # 17; If your answer is "NO", go to Question # 10.]
10. Should the sale be cancelled because of these defects or should the price be reduced? If you believe the price should be reduced, give the dollar amount of the reduction. Cancel Sale ______ Reduce Price by $_____
[If you find that the sale should be canceled, answer Questions #11 and 12; if not, go to # 14.]
11. If you find that the sale should be cancelled, should the sellers be given any credit against the return of the purchase price for the buyers' use of the property since April 6, 1989?
YES ___ NO ___
If your answer to this question is YES, give the credit for use in dollars. $ ________________ GO TO QUESTION # 12.
12. If you find that the sale should be cancelled, do you find that the defective item was constructed or made by the defendants, Jolin, Inc. and Joseph Blanchard, Jr.?
YES ___ NO ___
GO TO QUESTION # 13.
13. If your answer is YES, what damages, if any, are Belle Pass Terminal, Inc. and Richard Guidry entitled to collect from Jolin, Inc. and Joseph Blanchard, Jr. as a result of the sale of the defective item? $ ________________
14. IF YOU ANSWERED QUESTIONS #4 YES OR IF YOU DETERMINED IN QUESTION # 10 THAT THE SALE SHOULD BE CANCELED, DO NOT ANSWER QUESTION #15 AND 16; GO TO #17. IF YOU ANSWERED NO TO QUESTION # 4 AND YOU FOUND IN QUESTION #10 THAT THE SALE SHOULD NOT BE CANCELED, BUT THAT THE PROPER REMEDY WAS A REDUCTION OF THE PRICE, YOU MUST ANSWER QUESTIONS # 15 AND 16.
15. Is Harold Callais personally liable on the promissory note of Belle Pass along with Richard Guidry and Elmo Pitre, Jr.?
YES ___ NO _x_
16. Should Belle Pass, Richard Guidry, and Elmo Pitre, Jr. be ordered to pay all sums due under the note of $2,000,000.00, dated April 6, 1989?
YES _x_ NO ___
GO TO # 17.
17. S/Joseph D. Devillier 2/3/92
 FOREMAN DATE
On March 2, 1992, the trial court rendered judgment in accordance with the directed verdict and the jury's verdict. Judgment was rendered in the action on the promissory note in favor of Jolin and Blanchard and against Belle Pass, Guidry, and Pitre for $2,000,000.00 with interest of 13% from April 6, 1989, with a credit for installments paid through February, 1990, together with attorney's fees of $125,000.00. The claims of Callais, Belle Pass, and Guidry for breach of warranty, redhibition, and damages were denied. Likewise, the demands by Jolin and Blanchard against Callais were denied. Belle Pass, Guidry, and Pitre were cast for all costs.
Thereafter, Guidry filed a motion for judgment notwithstanding the verdict (JNOV) and, alternatively, for a new trial. By judgment, dated April 27, 1992, Guidry's motions were denied.
From this judgment, Belle Pass and Guidry appealed, assigning the following errors:
1. The trial court erred in failing to grant a directed verdict under LSA-C.C.P. art. 1810 when all of the documentary and testimonial evidence supported the finding that a sale of the lease was intended by the parties and indeed occurred on April 6, 1989.
2. The trial court judgment finding that there was no sale of the leases on April 6, 1989, was clearly erroneous and not supported by the record.
3. The trial court erred in denying Guidry's motion for judgment notwithstanding the verdict or, in the alternative, motion for new trial.
4. The trial court erred in refusing to give proper jury charges to the jury on the *476 issue of conditional sale as requested by Belle Pass and Guidry.
5. The jury verdict finding that there was no sale of the leases on April 6, 1989, was tainted by improper, misleading, and incomplete jury instruction regarding conditional sales and their effect in Louisiana.
6. The trial court's jury instructions regarding the sale of the leases or lease rights were misleading and were not in accordance with the facts adduced at trial.
7. The trial court erred in refusing to include the term "lease rights" in the special jury interrogatories and in refusing to address the issue of conditional sales in the special jury interrogatories.
8. The trial court erred in refusing to admit into evidence the judgment of eviction against defendants, Jolin and Blanchard.
9. The trial court erred in failing to grant the motion for directed verdict on the issue of whether the sale contracts should be reformed.
10. The trial court erred in refusing to grant the exception pleading the objection of no cause of action with regard to the issue of reformation.
11. The trial court finding essentially reforming the sale documents is manifestly erroneous.
12. The trial court erred in allowing Jesse Babcock to testify as an expert witness.
13. The trial court erred in refusing to grant the exception pleading the objection of no cause of action for rescission based on redhibition.
Jolin and Blanchard answered the appeal. In the answer, Jolin and Blanchard contend that the trial court erred in denying the claims against Callais and in failing to cast Callais in judgment solidarily with the other judgment debtors.[7] Jolin and Blanchard also contend that the trial court erred in failing to recognize their mortgage and vendor's lien and privilege on the property described in the act of sale and to recognize and maintain the writ of sequestration and privilege against the property and any and all of the rent revenues and income from the time of seizure.

EVIDENTIARY MATTERS

(Assignment of Error No. 8)
Belle Pass and Guidry contend that the trial judge erred in excluding from the evidence a trial court judgment of eviction rendered by the trial court on October 14, 1991. Belle Pass and Guidry reason that the judgment shows that Jolin and Blanchard were in violation of the leases or lease rights they allegedly conveyed to Belle Pass and that the judgment was proof that Belle Pass could not deliver what was sold.
Generally, all relevant evidence is admissible. LSA-C.E. art. 402. Relevant evidence is evidence having any tendency to make the existence of any fact that is of consequence to a determination of the action more probable or less probable than it would be without the evidence. LSA-C.E. art. 401; Pattison v. Valley Forge Insurance Company, 599 So.2d 873, 877 (La.App. 4th Cir.), writ denied, 604 So.2d 1001 (La.1992). However, relevant evidence may be excluded if, among other things, its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. LSA-C.E. art. 403. The use of the term "may" in the article emphasizes the discretionary contextual character of an article 403 determination. See Handbook on Louisiana Evidence Law, Authors' Notes, LSA-C.E. art. 403. Whether evidence is relevant is within the discretion of the trial judge, and his ruling will not be disturbed on appeal in the absence of a *477 clear abuse of his discretion. Pattison v. Valley Forge Insurance Company, 599 So.2d at 877; Citizens Bank & Trust Co. v. Consolidated Terminal Warehouse, Inc., 460 So.2d 663, 670 (La.App. 1st Cir.1984).
In refusing to permit the introduction of the judgment into evidence, the trial court stated that the judgment was "not so relevant to the issues of this case that prompted the filing of this lawsuit" to warrant the jury's attention and that the chances of misleading the jury far outweighed the judgment's probative value. Moreover, at the time of the trial of this case, the judgment of eviction was pending on appeal before this court.[8]
After carefully reviewing the judgment of eviction rendered by the trial court in light of the entire record in this matter, we find that the trial court did not abuse its discretion in refusing to permit Belle Pass and Guidry to introduce the judgment of eviction or to examine the witnesses regarding this judgment. The judgment had little probative value into the issues before the court, and its potential for unfair prejudice and confusion of the jury clearly outweighed any probative value the introduction of such evidence may have had. This assignment of error is without merit.

EXPERT TESTIMONY

(Assignment of Error No. 12)
Belle Pass and Guidry contend that the trial court erred in allowing Jesse Babcock to testify as an expert witness. Belle Pass and Guidry reason that Babcock's knowledge, skill, expertise, education and/or training did not qualify him to testify about the design or construction of the dock and bulkhead.
Trial judges have great discretion in determining the qualifications of experts and the effect and weight to be given expert testimony. State v. Stringer, 567 So.2d 758, 761 (La.App. 2nd Cir.1990). Experience alone may be sufficient to qualify a person as an expert. See Ballew v. Southland Corporation, 482 So.2d 890, 895 (La.App. 2nd Cir. 1986). Moreover, trial judges are generally given wide discretion in determining whether a question or subject falls within the scope of an expert witness's field of expertise. Bourgeois v. Puerto Rican Marine Management, Inc., 589 So.2d 1226, 1236 (La.App. 4th Cir. 1991), writs denied, 592 So.2d 1299, 1300 (La.1992); Nichols v. U.S. Rentals, Inc., 556 So.2d 600, 609 (La.App. 5th Cir.), writ not considered, 558 So.2d 597 (La.1990). Absent a clear abuse of the trial court's discretion in accepting a witness as an expert, appellate courts will not reject the testimony of an expert or find reversible error. State v. Stringer, 567 So.2d at 761-62.
In the instant case, after examination on his qualifications as an expert, Babcock was tendered as an expert in the field of marine surveying to determine maintenance, damage, repair, suitability or usability of wharves as a surveyor. Belle Pass and Guidry objected to Babcock's testimony as an expert in the field of dock design, construction, and inspection. Thereafter, the trial judge accepted Babcock as an expert in marine surveying, subject to his limitations as an engineer with regard to design and construction.
Babcock's knowledge, skill, expertise, education and/or training qualified him to testify about the field for which he was tendered, namely marine surveying. Belle Pass and Guidry correctly urge that Babcock should not have been admitted as an expert with regard to design or construction of the dock and bulkhead. However, the record clearly reflects that Babcock was not tendered or accepted as an expert witness in the field of design or construction. As such, this assignment of error is without merit.

DIRECTED VERDICT

(Assignments of Error Nos. 1 and 9)
Belle Pass and Guidry contend that the trial court erred in failing to grant the motion for directed verdict on the issue of whether a sale of the leases occurred and whether the sale had been reformed.
LSA-C.C.P. art. 1810 provides as follows:

*478 A party who moves for a directed verdict at the close of the evidence offered by an opponent may offer evidence in the event that the motion is not granted, without having reserved the right so to do and to the same extent as if the motion had not been made. A motion for a directed verdict that is not granted is not a waiver of trial by jury even though all parties to the action have moved for directed verdicts. A motion for a directed verdict shall state the specific grounds therefor. The order of the court granting a motion for a directed verdict is effective without any assent of the jury.
A motion for a directed verdict is appropriately granted when, after considering all of the evidence in the light and with all reasonable inferences most favorable to the movant's opponent, it is clear that the facts and inferences point so overwhelmingly in favor of granting the verdict, that reasonable jurors could not arrive at a contrary verdict. Adams v. Travelers Insurance Company, 589 So.2d 605, 608 (La.App. 2nd Cir.1991); Armstrong v. Lorino, 580 So.2d 528, 533 (La.App. 4th Cir.), writ denied, 584 So.2d 1166 (La.1991); Barnes v. Thames, 578 So.2d 1155, 1162 (La.App. 1st Cir.), writs denied, 577 So.2d 1009 (La.1991). However, if there is substantial evidence opposed to the motion, that is, evidence of such a quality and weight that reasonable and fair-minded men exercising impartial judgment might reach different conclusions, the motion should be denied, and the case should be submitted to the jury. Adams v. Travelers Insurance Company, 589 So.2d at 608; Cliburn v. Colonial Penn Insurance Company, 583 So.2d 103, 105 (La.App. 3rd Cir.1991); Armstrong v. Lorino, 580 So.2d at 533.
A trial judge has much discretion in determining whether or not to grant a motion for directed verdict. Barnes v. Thames, 578 So.2d at 1162. The standard of review for the appellate court is whether, viewing the evidence submitted, reasonable people could not reach a contrary verdict. Bergeron v. Blake Drilling & Workover Company, Inc., 599 So.2d 827, 849 (La.App. 1st Cir.), writs denied, 605 So.2d 1117, 1119 (La.1992); Cliburn v. Colonial Penn Insurance Company, 583 So.2d at 105. Moreover, the propriety of a directed verdict must be evaluated in light of the substantive law underpinning the claims. Adams v. Travelers Insurance Company, 589 So.2d at 608.
With regard to whether a sale of the leases occurred, the law is clear that a "sale is considered to be perfect between the parties, and the property is of right acquired to the purchaser with regard to the seller, as soon as there exists an agreement for the object and for the price thereof, although the object has not yet been delivered, nor the price paid." LSA-C.C. art. 2456; Succession of Dunham, 408 So.2d 888, 896 (La.1981); Varacalle v. Turner, 556 So.2d 836, 839 (La. App.1st Cir.1989).
With regard to reformation, a written instrument may be reformed against the original parties and their privies to correct an error or mistake in the contract, so as to make it accurately express the true intent and agreement of the parties. Placid Refining Company v. Privette, 523 So.2d 865, 868 (La.App. 1st Cir.), writ denied, 524 So.2d 748 (La.1988); First State Bank & Trust Company of East Baton Rouge Parish v. Seven Gables, Inc., 501 So.2d 280, 285 (La.App. 1st Cir.1986), writ denied, 502 So.2d 103 (La. 1987). The error or mistake must be mutual. Placid Refining Company v. Privette, 523 So.2d at 868; First State Bank & Trust Company of East Baton Rouge Parish v. Seven Gables, Inc., 501 So.2d at 285. Additionally, before an instrument will be reformed, there must be clear proof of the antecedent agreement as well as the error in committing it to writing. Pat S. Todd Oil Company, Inc. v. Wall, 581 So.2d 333, 336 (La.App. 3rd Cir.), writ denied, 585 So.2d 569 (La.1991); Placid Refining Company v. Privette, 523 So.2d at 868; First State Bank & Trust Company of East Baton Rouge Parish v. Seven Gables, Inc., 501 So.2d at 285. The burden is on the one seeking reformation to prove the error alleged by clear and convincing evidence. Pat S. Todd Oil Company, Inc. v. Wall, 581 So.2d at 336; Placid Refining Company v. Privette, 523 So.2d at 868; First State Bank & Trust Company of East Baton Rouge Parish v. Seven Gables, Inc., 501 So.2d at 285. Parol evidence is not *479 offered to vary the terms of the written instrument, but rather to show that the writing does not express the true intent or agreement of the parties. Placid Refining Company v. Privette, 523 So.2d at 868; First State Bank & Trust Company of East Baton Rouge Parish v. Seven Gables, Inc., 501 So.2d at 285.
In support of the position that Jolin and Blanchard sold the leases on April 6, 1989, Belle Pass and Guidry rely on the sale and mortgage, the "To Whom it May Concern" letter, and testimony to establish the intent of the parties. The sale and mortgage provided that Belle Pass purchased the following described property:
Any and all assets and improvements located on properties owned, leased, or rented by Jolin, Inc., Fourchon Docks, Inc. and Joe Blanchard in Fourchon, Louisiana.
The sale and mortgage also contained the following language:
Belle Pass Terminal, Inc. in this Bill of Sale purchases any and all lease rights that Jolin, Inc., Fourchon Docks, Inc. and Joseph E. Blanchard, Jr. may have on the property in Fourchon, Louisiana. Additionally, Belle Pass Terminal, Inc. agrees to abide by, honor, the aforesaid leases.
The "To Whom It May Concern" letter stated:
Once the note is paid in full, all leases presently held by Jolin, Inc., Fourchon Docks, Inc. and Joseph E. Blanchard, Jr., in effect as of this date are to be transferred to Belle Pass Terminal, Inc., Richard P. Guidry, and Elmo P. Pitre, Jr.
The "To Whom It May Concern" letter also provided that Belle Pass, Guidry, and Pitre would be responsible for the lease payments to Caillouet according to the lease, but that the amounts would be paid to Jolin, which would in turn send a check to Caillouet for the rent.
Generally, legal agreements have the effect of law upon the parties, and, as they bind themselves, they shall be held to a full performance of the obligations flowing therefrom. Kean v. Lemaire, 451 So.2d 151, 153-54 (La.App. 1st Cir.1984). Courts are bound to give legal effect to all contracts, according to the true intent of the parties, and the intent is to be determined by the words in the contract when they are clear and explicit and lead to no absurd consequences. LSA-C.C. arts. 2045 and 2046; Massachusetts Mutual Life Insurance Company v. Nails, 549 So.2d 826, 832 (La.1989); Forest v. Louisiana Farm Bureau Casualty Insurance Company, 582 So.2d 989, 991 (La. App. 1st Cir.1991); Ransom v. Camcraft, Inc., 580 So.2d 1073, 1077 (La.App. 4th Cir. 1991); Borden, Inc. v. Gulf States Utilities Company, 543 So.2d 924, 927 (La.App. 1st Cir.), writ denied, 545 So.2d 1041 (La.1989); Schroeter v. Holden, 499 So.2d 309, 311 (La. App. 1st Cir.1986); Kean v. Lemaire, 451 So.2d at 154.
When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent. Borden v. Gulf States Utilities Company, 543 So.2d at 927. The rules of interpretation establish that when a clause in a contract is clear and unambiguous, the letter of the clause should not be disregarded under the pretext of pursuing its spirit. Cashio v. Shoriak, 481 So.2d 1013, 1015 (La.1986); Borden v. Gulf States Utilities Company, 543 So.2d at 927.
As a general rule, parol evidence is inadmissible to vary, modify, explain, or contradict a writing. Kean v. Lemaire, 451 So.2d at 154. In Investors Associates Ltd. v. B.F. Trappey's Sons, Inc., 500 So.2d 909, 912 (La.App. 3rd Cir.), writ denied, 502 So.2d 116 (La.1987), the court noted that:
Contracts, subject to interpretation from the instrument's four corners without the necessity of extrinsic evidence, are to be interpreted as a matter of law. The use of extrinsic evidence is proper only where a contract is ambiguous after an examination of the four corners of the agreement.
However, as pointed out by the court in Investors Associates Ltd., there are exceptions which permit reference to parol and other outside evidence. One such instance is where the mutual intention of the parties has not been fairly explicit. In such instances, the court may consider all pertinent facts and *480 circumstances, including the party's own conclusions rather than adhere to a forced meaning of the terms used. Kean v. Lemaire, 451 So.2d at 154.
Further, when the terms of a written contract are susceptible to more than one meaning, or there is uncertainty or ambiguity as to its provisions, or the intent of the parties cannot be ascertained from the language employed, or fraud is alleged, parol evidence is admissible to clarify the ambiguity, show the intention of the parties, or prove fraud. Borden v. Gulf States Utilities Company, 543 So.2d at 927; Schroeter v. Holden, 499 So.2d at 311.
LSA-C.C. art. 2045 defines interpretation of a contract as "the determination of the common intent of the parties." Lindsey v. Poole, 579 So.2d 1145, 1147 (La.App. 2nd Cir.), writ denied, 588 So.2d 100 (La. 1991). Such intent is to be determined in accordance with the plain, ordinary, and popular sense of the language used, and by construing the entirety of the document on a practical, reasonable, and fair basis. Lindsey v. Poole, 579 So.2d at 1147. Moreover, LSA-C.C. art. 2047 provides that "[t]he words of a contract must be given their generally prevailing meaning. Words of art and technical terms must be given their technical meaning when the contract involves a technical matter." The rule of strict construction does not authorize perversion of language or the creation of ambiguity where none exists and does not authorize courts to make a new contract where the language employed expresses the true intent of the parties. Ransom v. Camcraft, Inc., 580 So.2d at 1077. One of the best ways to determine what the parties intended in a contract is the method in which the contract is performed, particularly if done consistently over and over again for a period of many years. Gamble v. D.W. Jessen & Associates, 509 So.2d 1041, 1043 (La.App. 3rd Cir.), writ denied, 514 So.2d 454 (La.1987). In other words, intent is an issue of fact which is to be inferred from all of the surrounding circumstances. Borden v. Gulf States Utilities Company, 543 So.2d at 927.
In the instant case, the evidence presented at trial to establish the true intent of the parties as to whether the leases were sold and whether the contract should be reformed consisted of the testimony of the parties to the transaction, including Blanchard, Callais, Guidry, and Pitre, as well as the attorneys and secretaries who drafted the documents and the accountants and other financial assistants who participated in the confection of the agreement.
Scotty Chabert, the attorney who prepared the documents to consummate the purchase of the oil assistant facility and docks at Fourchon, testified that he was approached initially by Pitre to provide legal assistance. Chabert testified that he was aware that the property upon which the Fourchon facility was located was leased. In discussing the method whereby the deal would be consummated, Chabert recommended that the parties purchase Jolin, which owned the facility and the lease rights. However, he was told that Blanchard could not sell the corporation for tax reasons and because of problems with his wife.
Chabert testified that he prepared the bill of sale of the movables from Jolin to Callais. He also prepared the sale and mortgage of the Fourchon facility. According to Chabert, he was not present when the parties executed the documents of transfer in that on April 6, 1989, he was in New Orleans attending a federal court hearing. As a result, he was not knowledgeable about what precisely had taken place in his office on that date.
Monica Charpentier was employed as Chabert's legal secretary between September of 1982 and June of 1989. Charpentier testified that, at Chabert's direction, she prepared the sale and mortgage by Jolin to Belle Pass as well as the $2 million note. Pursuant to Chabert's direction, Charpentier also prepared the sale of the movables and other ancillary documents.
Charpentier testified that she prepared the "To Whom It May Concern" letter on April 6, 1989, when the parties arrived at Chabert's office to consummate the sale. Although Chabert was not present in the office when the parties arrived to execute the sale documents, she and two other persons from Chabert's office were present for the closing. *481 During the course of the closing, Charpentier spoke with Chabert on the telephone, and he directed her to do what the parties wanted. According to Charpentier, the "To Whom It May Concern" letter was discussed among the parties to the instrument, and they instructed her to prepare the document. Although Charpentier could not remember precisely who provided the verbiage for that letter, she recalled that the accountant for Jolin, Michael Johnson, may have dictated the language. After she had completed preparing the letter, each of the parties signed the letter without objection.
Richard Paul Guidry testified that in the fall of 1988, Elmo Pitre and several others were attempting to put together a package to locate financing to go into business. According to Guidry, Pitre was attempting to purchase the dock facility owned by Jolin. After an unsuccessful attempt at obtaining financing through a New Orleans bank, Guidry involved Callais in Pitre's business venture. According to Guidry, the three men met almost weekly for two months to discuss the proposed deal. Guidry testified that the arrangement with Blanchard was for $3 million. Callais would put up $1 million, and Blanchard would agree to carry a $2 million note with Guidry's and Pitre's personal endorsement. According to Guidry, the $1 million would be used to purchase the movable equipment so that Callais would have some security for his investment. Callais would then lease the equipment back to Belle Pass.
Guidry testified that on April 6, 1989, the parties met at Chabert's office to review and sign the documents for the sale. Guidry testified that, based on his understanding, Belle Pass would purchase the two Caillouet leases, the Milchem lease, and another lease, as well as the improvements located on the leased property. The price for these items was $2 million, which would be in the form of a note to Blanchard. Guidry testified that, prior to the time of the purchase, Chabert had advised them that the consent of Caillouet was needed. Guidry further testified that Blanchard assured him that he had indeed obtained the consent of Caillouet.
According to Guidry, the "To Whom It May Concern" letter was executed for several reasons. First, the act of sale failed to mention that the proceeds from the Milchem lease would be applied directly to Belle Pass's outstanding indebtedness to Blanchard. Additionally, the parties wanted to ensure that the monthly rentals on the Caillouet leases were paid to Jolin so that Jolin could in turn pay Caillouet for the rent. Further, according to Guidry, the letter gave Belle Pass additional security that Blanchard would transfer the leases to Belle Pass after the note was fully paid.
Guidry testified that immediately after the sale was consummated on April 6, 1989, Belle Pass began operations of the docks, which had previously been operated by Jolin and Blanchard. After Belle Pass commenced operations, Callais and Guidry became aware of certain criminal charges and/or indictment against Pitre involving drug or money laundering allegations. As a result, Pitre was asked to resign. Pitre and Blanchard objected to Pitre's dismissal. Guidry testified that Blanchard objected because he had accepted a note in payment for the sale because Pitre, who had experience with the type of operation conducted by Belle Pass, would be running the operation. Guidry acknowledged that Pitre's termination is the subject of ongoing litigation.
Further, Guidry testified that in June of 1989, he, Pitre, Callais, Chabert, Givens, and Blanchard met at Blanchard's home to discuss the Milchem lawsuit. Guidry denied being advised by Givens that Belle Pass did not need to join the suit against Milchem because Blanchard still owned the leases.
Shortly after acquiring the docks from Jolin, Belle Pass began negotiations with Caillouet for the Chevron tract. In March, 1990, Guidry, Callais and Bob Faulk met with Caillouet to discuss finalizing the sale. At that meeting, Guidry and Callais disclosed to Caillouet that Belle Pass had purchased Jolin's leases for the docks. Upon the disclosure of this information, Guidry testified that Caillouet was upset and indicated that permission for the sale of the leases by Jolin had not been given by Caillouet. Guidry felt that Belle Pass's position was somewhat precarious because the leases with Jolin could be canceled for violating provisions of the lease. *482 Guidry further stated that, at this time, he first learned of the title problem with the Belle Pass situation. Prior to this time, Guidry believed that Blanchard had obtained permission from Caillouet to sell the leases.
Harold Joseph Callais testified that, during the course of his dealings with Blanchard, he was advised that Blanchard had permission from the Caillouets to sell the leases. Callais testified that, pursuant to the arrangement with Blanchard, he was purchasing the movables and Belle Pass was purchasing the improvements, leases, and everything that went with it. Callais outlined that Belle Pass paid Blanchard monthly installments of $29,000.00 on the $2 million note for a ten-year period. In addition, Belle Pass made rental payments of $6,700.00 to Blanchard, which Blanchard in turn paid to Caillouet.
According to Callais, he encountered difficulty with Blanchard regarding the amount of insurance coverage Blanchard demanded. At that time, Callais began looking into the act of sale and leases to determine his position. At the same time, Belle Pass was attempting to expand its operation and was continuing to explore the acquisition of the Chevron leases from Caillouet. In a meeting with Stephen Caillouet, Callais indicated that Belle Pass, which had purchased Blanchard's leases, wanted to expand its operations to include the area covered by the Chevron leases. Callais testified that Caillouet was very upset, asked him for a copy of the sale documents, and ended the meeting abruptly. Negotiations for the sale of the Chevron leases were officially terminated by Caillouet. Thereafter, pursuant to the advice of counsel, Callais and Belle Pass filed suit to rescind the sale because of Blanchard's failure to obtain permission from Caillouet to sell the leases.
Callais further testified that, as owner of the movable property, he insisted on the inclusion of certain language in the cash sale of the movables. This language provided as follows:
IT IS HEREBY AGREED AND UNDERSTOOD by the parties hereto that if at any time a default or problem should arise wherein the equipment hereinabove described may be jeopardized or restricted then Harold Callais shall be given the unconditional right by Jolin Inc. to remove said equipment from the property located at Fourchon, Louisiana, within 60 days of receipt of written notice or default from Jolin, Inc.
Callais testified that the language was included to assure that, in the event Blanchard foreclosed on the leases, he could remove his equipment.
Callais also admitted making an offer to Caillouet in the event Caillouet decided to terminate the leases with Blanchard. Callais' proposal included monthly rental payments of $10,000.00 for the first five-year period, monthly rental payments of $12,500.00 for the second five-year period, monthly rental payments of $15,000.00 for the third five-year period, and monthly rental payments of $17,500.00 for the fourth five-year period.
Lionel Lagarde testified that he became the secretary and treasurer of Belle Pass in the early part of 1989 and continued to serve in that capacity at the time of trial. According to Lagarde, he assisted Pitre in putting together a prospectus to obtain financing for the purchase of the Fourchon docks. Lagarde was aware that the docks were located on property leased by Jolin from Caillouet. As far as Lagarde knew, Callais, Pitre, and Guidry were also aware of this fact. Lagarde did not participate in the negotiations with Blanchard; he was responsible for the accounting part of the arrangement. After the agreement was consummated, Lagarde mailed monthly checks to Jolin; one for $29,000.00 for the note payment, and one for $6,700.00 for the lease payment.
Elmo Pitre, Jr. testified that, at the time of the facts giving rise to the instant suit, he leased property from the Caillouets on Pass Fourchon on which he operated a restaurant. His restaurant was located near Jolin's docks. One day Blanchard entered Pitre's restaurant and discussed his interest in selling his business. Upon receiving this information, Pitre contacted Lionel Lagarde and Sidney Duet to discuss various proposals to purchase Jolin from Blanchard. Blanchard and his accountant, Johnson, provided Pitre *483 with the financial information on Jolin so that a pro forma could be prepared to obtain financing. The pro forma included copies of Jolin's leases with Caillouet. After a period of discussions with Blanchard, Pitre received a letter from Blanchard setting forth the agreement to purchase Jolin for $3 million. Pitre was aware of the clause in the Caillouet leases which required Caillouet's consent prior to transfer of the leases. Pitre also had a copy of an appraisal setting forth the restrictions on the sale of the Caillouet leases. Initially, Pitre was unable to obtain financing for this venture.
Thereafter, Pitre involved Richard Guidry in the proposal. Guidry advised Pitre that he had friends in New Orleans who may be able to provide some of the financing. Guidry was attempting to put a finance package together for Pitre, for which Guidry would receive a commission. However, Guidry was unsuccessful in obtaining financing.
Later, Guidry advised Pitre that he and Callais may be interested in financing the deal, and the two would participate from an ownership position. The three men met to discuss the options and subsequently agreed on their participation in the venture. The three men also entered final negotiations with Blanchard. As a result of these negotiations, the deal was structured in such a way that Callais would purchase the equipment for $1 million and would provide working capital. Blanchard would owner finance the remaining $2 million with Pitre's personal guarantee on the note.
According to Pitre, the leases were never to be transferred or sold at the time of the sale. Prior to the consummation of the sale on April 6, 1989, the parties met at Blanchard's house to discuss the finalization of the deal and review the documents. From the beginning, Chabert had advised the parties that Belle Pass should just purchase the stock in Jolin. However, because the principals in Belle Pass did not have $3 million to pay for the stock, the deal was structured in this manner. Pitre further testified that the provision "that Belle Pass purchases any and all lease rights Jolin or Blanchard may have at Fourchon and that Belle Pass would abide by the leases" was placed in the document so that Belle Pass could come and go from the leased property.
Pitre testified that the entirety of the documents were read aloud on the date of the closing, including the provision that Belle Pass, Guidry, and Pitre would be responsible for the lease payments to Caillouet according to the terms of the lease and that such amounts would be sent to Jolin, who would in turn send the payments to Caillouet and the provision that, once the $2 million note was paid in full, Jolin and Blanchard would transfer the leases to Belle Pass, Guidry, and Pitre. Pitre understood that Blanchard would later sell Jolin to Belle Pass.
After the difficulties arose with Blanchard following a letter in February of 1990, regarding the rental payments and insurance issues, Callais, Pitre, Guidry, and Blanchard, as well as others, met to discuss the issues. After a heated argument, Blanchard left the meeting. According to Pitre, thereafter, when he inquired as to what the problems were, Callais advised him as follows:
"Elmo," he says "you hardheaded. You have always been hardheaded. I'm trying to put a million dollars in your pocket and you're too stupid to see what's going on."
Pitre stated that he was confused because Blanchard was "broke."
Pitre stated that he had been terminated by Belle Pass and had a suit pending against Callais and Guidry for the termination. Pitre also acknowledged that he was a convicted felon.
Joseph Blanchard testified that he was the owner and incorporator of a company called Fourchon Docks, Inc., which subsequently changed its name to Jolin, Inc. Blanchard testified that he signed various documents on April 6, 1989, individually and in his capacity as president of Jolin.
According to Blanchard, he negotiated his first lease with Caillouet in 1973. A few years later, in 1977, Blanchard negotiated a second lease with Caillouet for a second tract of land. The two leases were amended in 1981. Blanchard subsequently entered into a sublease with Milchem for a portion of the leased property.
*484 In late fall of 1988, Blanchard began negotiations with Pitre and Lagarde for the sale of the docks at Fourchon. Thereafter, Blanchard gave Pitre a letter acknowledging that he would sell the stock in Jolin for $3 million, if Pitre could raise the necessary funding. Blanchard supplied Pitre with financial statements, records, leases, and all other information relevant to the docks.
On April 3, 1989, Blanchard had an offer from Milchem to purchase the docks for $3 million, subject to certain conditions. Milchem sent a $20,000.00 deposit. The sale to Milchem was to close prior to April 17, 1989. Blanchard and officials from Milchem met with Caillouet. Milchem advised Caillouet that, if Caillouet did not want to assign the leases, Milchem would simply purchase the stock in Jolin and obtain the leases in that manner. However, Blanchard later turned the Milchem offer down and returned the deposit.
Blanchard testified that prior to the April 6, 1989, sale, the parties met at Blanchard's home where they discussed the contents of the sale documents with Chabert. According to Blanchard, all parties were well aware that the leases could not be sold without the consent of Caillouet. Although Chabert advised Belle Pass to simply purchase the stock in Jolin, Belle Pass did not have the cash to acquire the docks in this manner. During the course of the discussions, Guidry became concerned that, after Belle Pass began paying its note, Blanchard could stop Belle Pass from coming onto the leased property. According to Blanchard, Chabert inserted the provision giving Belle Pass a right to use the premises so long as it remained current with its payments.
Blanchard testified emphatically that it was clear to all parties that the leases were not to be transferred and that Caillouet was not to be approached for their approval. In fact, the whole arrangement was engineered so as to not disturb the relationship with Caillouet, which was the desired result of Belle Pass and Blanchard. As a result, the lease payments by Belle Pass were made to Jolin, who in turn paid Caillouet. Moreover, Blanchard noted that, after 1992, the monies derived from the Milchem sublease were to be applied directly to Belle Pass's indebtedness to him, which further evidenced the lack of any intention to transfer the leases to Belle Pass.
The closing took place on April 6, 1989, at Chabert's office. Pitre, Guidry, Callais, Johnson, and Blanchard attended, and a notary and two secretaries from Chabert's office were also present. The parties made numerous minor revisions to the documents. According to Blanchard, there were in fact two transactions, namely a sale of movables and a sale of assets. Under the terms of the agreement for the sale of the movables, Callais put up $1 million. Under the terms of the sale with mortgage, Belle Pass would have the right to use the dock facility and be permitted to occupy the premises as long as they were current with their payments, which were represented by the $2 million note. Thereafter, all parties signed the agreement. After the agreement was signed, the discussions led to the point that Belle Pass was concerned that, after it made payments for ten years, it would own nothing. Therefore, the "To Whom It May Concern" letter was drafted, noting that upon full payment of the obligation for the $2 million, Blanchard would transfer the leases to Belle Pass, Guidry, and Pitre, which Blanchard believed would be in the nature of a sale of the stock in Jolin.
Blanchard testified that following the closing Belle Pass began operation of the Fourchon docks and was continuing to operate the docks on the date of trial. Subsequent to the closing, the parties met again to discuss the litigation with Milchem. During these discussions, Blanchard's attorney in the Milchem litigation explained that Jolin owned the leases and that they had not been transferred to Belle Pass. No one present at the meeting, including Belle Pass's officers, objected to these statements.
Blanchard further testified that from May, 1989, through March, 1990, he received monthly payments from Belle Pass for $29,862.20 and $6,700.00, as payment on the note and lease, respectively. Although the contract called for Belle Pass to provide insurance coverage of $2 million, Belle Pass failed to provide insurance coverage. According to *485 Blanchard, the monthly checks also began to arrive after the agreed upon date. As a result, in February, 1990, Belle Pass was notified of its defective performance of its obligations under the agreement. When Blanchard later attempted to discuss the matter with Guidry, he was advised that a lawsuit was being filed. Prior to this time, Blanchard testified that he had never received any complaints about the condition of the leased premises.
Michael Johnson, the accountant for Jolin, testified that he was employed by Jolin since 1978. He initially worked for Jolin on a part-time basis while he was in college and was later employed on a full-time basis in January, 1983. At the time he left Jolin's employ, Johnson was the secretary-treasurer of the corporation.
According to Johnson, Blanchard discussed the possibility of negotiating for the sale of the business. Thereafter, Blanchard discussed this option with two prospective purchasers: Milchem and Elmo Pitre. On or about November 10, 1988, Blanchard sent a letter to Pitre and his associates, confirming Pitre's agreement to purchase 100% of the stock in Jolin for $3 million. The sale was conditioned upon the purchaser's obtaining financing for $3 million and completion of the sale within thirty days of the date of the letter. Milchem offered to purchase the business for $3 million;[9] however, according to Johnson, the Milchem offer was never finalized. Shortly after the Milchem offer, Jolin consummated the arrangement with Belle Pass and Callais.
Johnson was present on April 6, 1989, in Chabert's office for the execution of the documents to consummate the sale from Jolin to Belle Pass. Johnson testified that included in the agreement with Belle Pass was an understanding that, after the prepaid rental on the existing Milchem lease expired, the monthly rental payments under the Milchem lease would be applied directly to Belle Pass's indebtedness to Jolin.[10] According to Johnson, the Milchem payments were going to Jolin because Jolin owned the leases. The parties also discussed the language in the documents regarding the transfer of the leases upon payment of the indebtedness. The parties also discussed that Belle Pass, Guidry, and Pitre would be responsible for the lease payments to Caillouet. The amounts due would be paid to Jolin, who would in turn send the payment to Caillouet.
Johnson specifically recalled discussion at the April 6, 1989, closing regarding the consent of Caillouet for the sale. According to Johnson, Blanchard emphatically informed the group that he did not need Caillouet's consent because he was not selling the leases. Johnson testified that Belle Pass was never told that Caillouet's consent had been obtained.
According to Johnson, he thought the inclusion of the language in the bill of sale to the effect that Belle Pass purchased any and all lease rights that Jolin or Blanchard may have on the Fourchon property and agreed to abide by the leases was unusual, but that Belle Pass wanted the language included so that the company would have the right to go on the property to work the business. According to Johnson, the arrangement with Belle Pass was specifically structured to circumvent the prohibition against transferring the Caillouet leases. Moreover, Johnson acknowledged that the property sold was of little use to anyone without the leases. However, Johnson explained that Jolin sold to Belle Pass the right to use the facility, namely to put their work crews there, to land a helicopter, to have a dock, and to load and unload vessels. Jolin was not sold to Belle Pass, nor did Belle Pass purchase all of Jolin's assets. Johnson noted that the leases would be transferred to Belle Pass after the payment of all of the monies due under the contract, but that at the time of trial, Jolin could not deliver clear title to the leases to Belle Pass, unless Belle Pass purchased the stock in Jolin.
Johnson testified that after April, 1989, several problems developed. When a problem *486 arose with the Milchem leases, Jolin filed suit against Milchem to enforce the lease. The parties discussed whether Belle Pass should join the suit. According to Johnson, at that point everyone acknowledged that Belle Pass should not join the suit because they did not own the leases and that Jolin and Blanchard owned the leases. Another problem developed between Belle Pass and Jolin when Belle Pass failed to pay the monthly rental timely.
Johnson also testified regarding the total amount of gross receipts for the business done by Belle Pass between April, 1989, and October, 1991. According to Johnson, gross revenues for that period totalled $3,600,209.00. Moreover, Johnson testified that on the date of trial, Belle Pass continued to operate the dock facilities at Fourchon.
Kenneth Givens, the attorney who represented Blanchard and Jolin in the litigation against Milchem, testified that on May 15, 1989, approximately one month after the sale from Jolin to Belle Pass, he met with various parties, including Blanchard, Pitre, Chabert, Guidry, and Johnson, to discuss the Milchem suit. Among the items discussed was whether Belle Pass should join in prosecuting the action against Milchem. Givens advised the parties that Jolin was the proper party to be litigating the Milchem lease lawsuit. According to Givens, the parties affiliated with Belle Pass inquired into whether they received the leases, but that he advised them that Blanchard had the leases, which he could not sell. None of the parties disputed Givens' assessment. However, Givens made his observations and fashioned his opinion without having actually reviewed the documentation of the sale, but subsequently reviewed the documents.
Stephen Caillouet, secretary-treasurer of Caillouet Land Corporation, testified that the company is a closely-held, family corporation which purchased and owns a significant amount of acreage in Lafourche Parish. Caillouet testified that in 1973 the corporation entered into a lease with Blanchard for some property along Pass Fourchon. Thereafter, in 1977, the corporation entered into a second lease with Blanchard for a portion of property adjacent to the property leased in the 1973 lease. In 1981, the leases were amended to extend the term of the leases and to include a prohibition against the sublease, sale, transfer, or assignment of the leases without the prior written consent of the corporation.
On several occasions during the lease term, Blanchard had requested permission to pledge or assign the leases. On one occasion, Blanchard wanted to assign the leases to Citizens Bank and Trust Company. In 1985, Blanchard wanted to pledge or assign the lease to Terrebonne Bank and Trust Company. On both occasions, Caillouet granted its consent for the pledge or assignment without requiring any additional rent and/or remuneration for its consent. However, when Fourchon Docks, Inc. attempted to sublease a portion of the leased property, Caillouet agreed to the sublease, but required that the corporation receive 25% of the monthly rental after a certain period of time. Caillouet reasoned that the corporation had entered into an agreement to permit Blanchard to operate a docking facility on their land and, if Blanchard was going to use the corporation's property in any other manner for profit, then the corporation was entitled to a share of this profit.
Caillouet testified that prior to April 6, 1989, neither he nor anyone connected with the corporation, was aware of the sale and mortgage agreement or the "To Whom It May Concern" letter executed between Jolin and Blanchard and Belle Pass. According to Caillouet, Blanchard had never discussed the transaction with Belle Pass with Caillouet. Caillouet had been engaged in negotiations with Belle Pass for the lease of the Chevron tract since May, 1989. Caillouet first learned of the transaction in March of 1990, when he met with Callais and Guidry regarding the Chevron tract. At that time, Caillouet was interested in finalizing a lease arrangement on the Chevron tract with Belle Pass, and Callais presented the sale and mortgage agreement and the "To Whom It May Concern" letter. Caillouet informed Callais and Guidry that the corporation was unaware of the transaction, did not consent to the transaction, and would not recognize the transaction. Caillouet testified that the corporation's *487 consent was required to effect a transfer of the leases.
Caillouet also noted that, at the March, 1990 meeting, Callais had an envelope containing a signed, executed lease for the Chevron tract. However, according to Caillouet, Callais was not going to deliver the documents because he wanted to make an arrangement on the Blanchard tract.
After this meeting with Callais and Guidry, the corporation met to discuss the matter. The corporation's executive committee reviewed the documents and concluded that Jolin and/or Blanchard had sold the leases without consent in violation of the express terms of the leases. Accordingly, the executive committee recommended that Blanchard be placed in default and sent Blanchard a letter. Thereafter, Blanchard met with Caillouet to discuss the matter. Blanchard advised Caillouet that he did not ask for the corporation's consent because he did not sell the leases and because he did not want to pay them any more money.
Martin Glynn, a real estate appraiser and president of Central Appraisal Systems, testified that he prepared an appraisal on the Fourchon docks property on November 4, 1985, in connection with a bank loan. Glynn noted that he was appraising a fee simple interest. The value set forth in the appraisal was also based upon the assumption that the leases could be assigned. Moreover, Glynn testified that a critical factor in his valuation was that, without the right to sell, assign, or transfer the leases, the property had no market value.
After hearing all of this evidence, the jury determined that Jolin and Blanchard did not sell the leases to Belle Pass, Guidry, and Pitre on April 6, 1989. The jury apparently interpreted the contract as a sale of the docking business located on the Fourchon docks and determined that the leases themselves had not been sold. The evidence clearly revealed that all parties were familiar with the prohibition contained in the Caillouet leases against the sale of the leases without prior written consent of the lessor. The evidence also clearly revealed that the principals of Belle Pass had copies of the leases during the course of the negotiations with Blanchard. Moreover, the principals of Belle Pass had a copy of the appraisal of Glynn, who noted the consent requirement. Additionally, the attorney who drafted the documents on behalf of the principals of Belle Pass advised them to proceed with the arrangement in a different manner (stock acquisition) because of the need to obtain consent from Caillouet.
With regard to whether a sale of the leases had taken place, the testimony of the parties to the transaction was contradictory. While Callais and Guidry were adamant about their belief that the leases had been transferred, Blanchard and Pitre (one of the former principals of Belle Pass) adamantly denied that the leases had been transferred.
Moreover, the actions of the parties subsequent to the sale support the conclusion that the intention of the parties was not to transfer the leases. The testimony of Givens, the attorney who represented Jolin in the Milchem suit filed shortly after the April 6, 1989, sale, revealed that the parties discussed the necessity of Belle Pass becoming a litigant in that lawsuit and that the consensus was that, because Belle Pass had not purchased the leases, its participation was unnecessary.
Additionally, if the leases had been purchased for the $2 million on April 6, 1989, why was it necessary for Belle Pass to make an additional payment of $6,700.00 each month (an amount equal to the rental payment) over and above the monthly payment on the $2 million note? Moreover, why was such payment made to Jolin as opposed to the lessor directly?
Although Belle Pass and Guidry strenuously argue that the evidence supports their position that the April 6, 1989, transaction was a conditional sale, which is not recognized in Louisiana, after considering all of the testimony in this matter, the jury apparently found that there was no conditional sale. The parties purchased and sold a definite thing (the right to operate the docking business on the leased property) for a specific price ($2 million). As a result, the jury determined that Jolin and Blanchard were entitled to the unpaid balance on the $2 million note.
*488 The trial judge, who heard all of the evidence presented at trial apparently concluded that the facts and inferences did not point so overwhelmingly in favor of granting the verdict that reasonable jurors could not arrive at a contrary verdict. As a result, he denied Belle Pass's and Guidry's motions for directed verdict on the issues of whether the leases were sold and whether the contract had been reformed. Applying the legal precepts relative to directed verdicts to the facts of the instant case, we conclude that the trial judge did not err in refusing to grant Belle Pass's and Guidry's motions for directed verdict. The record clearly reveals that the facts and inferences do not point so overwhelmingly in favor of granting the verdict, that reasonable jurors could not arrive at a contrary verdict. As such, we cannot say that the trial court erred in refusing to grant Belle Pass's and Guidry's motion for directed verdicts. These assignments of error are without merit.

JURY INSTRUCTIONS/INTERROGATORIES

(Assignments of Error Nos. 4, 5, 6, and 7)
Belle Pass and Guidry contend that the trial court's jury charges were inadequate and completely devoid of language regarding the nature, elements, and effects of a conditional sale. Belle Pass and Guidry further contend that the trial court's jury instructions with regard to the sale of leases and lease rights were confusing, inaccurate, misleading, and not in accordance with the evidence adduced at trial and that the omission of the term "lease rights" from the interrogatories was confusing to the jury.
LSA-C.C.P. art. 1792 addresses jury charges and provides as follows:
A. At any time during the trial, the court may instruct the jury on the law applicable to any issue in the case.
B. After the trial of the case and the presentation of all the evidence and arguments, the court shall instruct the jurors on the law applicable to the cause submitted to them.
C. This charge shall be in writing or recorded in the same manner as testimony taken in the case.
In a jury trial, the judge has a duty to charge the jury as to the law applicable in a case and the correlative right and responsibility to require that the jury get only the correct law. Sparacello v. Andrews, 501 So.2d 269, 277 (La.App. 1st Cir.1986), writ denied, 502 So.2d 103 (La.1987). It is the judge's responsibility to reduce the possibility of confusing the jury, and he may exercise the right to decide what law is applicable to prevent counsel from arguing law which the trial judge deems inappropriate. Sparacello v. Andrews, 501 So.2d at 277. The judge is not required to give the precise instruction submitted by either party, but must give instructions which properly reflect the law applicable in light of the facts of the particular case. Manuel v. Louisiana Farm Bureau Casualty Insurance Company, 563 So.2d 916, 918 (La.App. 3rd Cir.1990); Sparacello v. Andrews, 501 So.2d at 277.
A charge to the jury, even if it correctly states the law, must be based on evidence adduced in the case. Knight v. First Guaranty Bank, 577 So.2d 263, 272 (La.App. 1st Cir.), writs denied, 581 So.2d 688, 690 (La.1991). A trial judge is not required to give a charge unless the facts support the giving of the charge. Knight v. First Guaranty Bank, 577 So.2d at 272.
Adequate instructions are those instructions which fairly and reasonably point up the issues presented by the pleadings and evidence and which provide correct principles of law for the jury's application thereto. Doyle v. Picadilly Cafeterias, 576 So.2d 1143, 1152 (La.App. 3rd Cir.1991); Sparacello v. Andrews, 501 So.2d at 277. The adequacy of jury instructions must be determined in light of the jury instructions as a whole. Doyle v. Picadilly Cafeterias, 576 So.2d at 1152.
An appellate court must exercise great restraint before overturning a jury verdict on the suggestion that the instructions were so erroneous as to be prejudicial. Doyle v. Picadilly Cafeterias, 576 So.2d at 1152. The standard of review required of *489 this court in determining whether an erroneous jury instruction has been given requires a comparison of the degree of error with the jury instructions as a whole and the circumstances of the case. Gunn v. AMICA Mutual Insurance Co., 611 So.2d 805, 808 (La.App. 3rd Cir.1992), writ denied, 613 So.2d 999 (La.1993).
If the improper charges contributed to the verdict, no weight should be given to that portion of the verdict. Knight v. First Guaranty Bank, 577 So.2d at 270. In such instance, the appellate court must make an independent review of the record in order to determine which party should prevail on that issue by a preponderance of the evidence. Knight v. First Guaranty Bank, 577 So.2d at 270.
Moreover, LSA-C.C.P. art. 1793 outlines the procedure by which objections to the proposed jury instructions are to be made and provides as follows:
A. At the close of the evidence, or at such earlier time as the court reasonably directs, a party may file written requests that the court instruct the jury on the law as set forth in the requests.
B. The court shall inform the parties of its proposed action on the written requests and shall also inform the parties of the instructions it intends to give to the jury at the close of the evidence within a reasonable time prior to their arguments to the jury.
C. A party may not assign as error the giving or the failure to give an instruction unless he objects thereto either before the jury retires to consider its verdict or immediately after the jury retires, stating specifically the matter to which he objects and the grounds of his objection. If he objects prior to the time the jury retires, he shall be given an opportunity to make the objection out of the hearing of the jury.
This provision creates a mandatory rule for preserving an objection to a trial court's ruling regarding requested jury instructions. Martin v. Francis, 600 So.2d 1382, 1387 (La.App. 1st Cir.), writ denied, 606 So.2d 541 (La.1992). In order to preserve the right to appeal a trial court's refusal to give a requested instruction or its giving of an erroneous instruction, a party must not only make a timely objection, but must state the grounds of his objection. Martin v. Francis, 600 So.2d at 1387; Cole v. Celotex Corporation, 588 So.2d 376, 380 (La.App. 3rd Cir.1991), affirmed, 599 So.2d 1058 (La.1992). See Trans-Global Alloy Limited v. First National Bank of Jefferson Parish, 583 So.2d 443, 448 (La.1991). Merely making an objection, without assigning any reasons therefor, is insufficient. Martin v. Francis, 600 So.2d at 1387.
In the instant case, we must first determine whether Belle Pass and Guidry properly preserved their objection to the allegedly improper jury instructions. In objecting to the proposed jury instructions regarding conditional sales, Belle Pass and Guidry joined in an in globo objection made to the jury instructions by Callais and proposed that "the conditional sale should have been explained with particularity the effects of a conditional sale that it is in fact a sale with all the warranties, even though the parties did not intend the effects of the conditional sale." In objecting to the proposed instructions regarding the sale of the leases and/or lease rights, Belle Pass and Guidry simply stated that instead of charging that "if you found the lease rights were sold and that the landowner did not consent then you may conclude that JolinI believe that it should be that you must conclude that Jolin breached the agreement." (Emphasis added). We find this objection sufficient to preserve their right to appeal the trial court's refusal to give their proposed jury charge.
Having found that Belle Pass and Guidry properly preserved their objection to the jury charges, we must determine whether the trial court gave an erroneous instruction.
A "sale is considered to be perfect between the parties, and the property is of right acquired to the purchaser with regard to the seller, as soon as there exists an agreement for the object and for the price thereof, although the object has not yet been delivered, nor the price paid." LSA-C.C. art. 2456; Succession of Dunham, 408 So.2d at 896; Varacalle v. Turner, 556 So.2d at *490 839. However, Louisiana does not recognize a "conditional" sale whereby the vendor remains the owner of the property until the price is paid. See Succession of Dunham, 408 So.2d at 896-97; Varacalle v. Turner, 556 So.2d at 839-40.
In his instructions, the trial court stated:
A sale is defined in our Civil Code as a contract or agreement in which one person gives a thing to another, for a price in money. The other person gives the price to get the thing. Contract is made when the parties agree on the thing and the price and when they consent to the sale. Louisiana does not recognize conditional sales, that is, a sale where the ownership of the object sold will not pass unless some condition or event happens.
The seller, the person on one side of the contract of sale, has to do two things: he must deliver what he sells and he must warrant what he sells. The warranty includes the guarantee to the buyer, that he can have and use the object free from claims of others, and that the object is free of defects that might make it unfit for the use intended by the parties from the contract.
The warranty exists even if it is not stated in the contract, as long as the contract does not say that there is no warranty.
We find that this is an accurate statement of the law. Moreover, in a later portion of his charge, the trial judge identifies the controversy between the parties with regard to the leases and further charges the jury as follows:
If you find that the lease rights were sold and that the landowner, Caillouet Land Corp., did not consent, then you may conclude that Jolin and Joseph Blanchard have breached their obligations to the buyers to deliver the leases and to insure peaceful possession of what was bought. You must then cancel the sale and give the buyers the relief that they ask for. If you find that the leases were not sold, then you must reject this part of the plaintiffs' claim.
Reviewing the trial judge's instructions, in their entirety, we find that the instructions on the issues of conditional sales and the sale of the lease rights were adequate. The trial judge may have chosen not to expound on conditional sales, beyond what is included in the charge, to reduce the possibility of confusing the jury. Moreover, he may have limited an expansive discussion of the law on conditional sales in light of the pleadings and facts of this case. Further, the answers to the jury's interrogatories regarding the sale of the leases or lease rights reveal that the jury was not confused or mislead. Pursuant to the instructions stating "[i]f you find that the leases were not sold, then you must reject this part of the plaintiffs' claim," the jury answered in the negative, to the following interrogatory:
Did Jolin, Inc. and Joseph Blanchard, Jr. sell the leases from Caillouet Land Corporation to Belle Pass Terminal, Inc., Richard Guidry, and Elmo Pitre, Jr. on April 6, 1989?
Clearly, the jury understood the law with regard to the sale of the lease. These assignments of error are without merit.

MERITS

(Assignments of Error Nos. 2 and 11)
In these assignments of error, Belle Pass and Guidry contend that the verdict rendered by the jury is manifestly erroneous and is not supported by the evidence. Belle Pass and Guidry reason that the jury's determination that the leases had not been sold on April 6, 1989, is clearly wrong and that the sale and mortgage were reformed in accordance with the "To Whom It May Concern" letter is, likewise, clearly wrong.
In reviewing factual findings, the appellate court may not set aside a trial court's finding of fact in the absence of manifest error or unless clearly wrong. Stobart v. State, Department of Transportation and Development, 617 So.2d 880, 882 (La.1993); Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). For an appellate court to reverse a trial court's factual finding, it must find from the record that a reasonable factual basis does not exist for the finding of the trial court and *491 that the record establishes that the finding is clearly wrong. See Mart v. Hill, 505 So.2d 1120, 1127 (La.1987). Thus, the reviewing court must do more than simply review the record for some evidence which supports or controverts the trial court's finding. The reviewing court must review the record in its entirety to determine whether the trial court's finding was clearly wrong or manifestly erroneous. Stobart v. State, Department of Transportation and Development, 617 So.2d at 882.
The issue to be resolved is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. Stobart v. State, Department of Transportation and Development, 617 So.2d at 882. Even though an appellate court may feel its own evaluations and inferences are more reasonable than the factfinder's, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. Stobart v. State, Department of Transportation and Development, 617 So.2d at 882.
Moreover, where two permissible views of the evidence exist, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Stobart v. State, Department of Transportation and Development, 617 So.2d at 883. However, where the documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face that a reasonable factfinder would not credit the witness's story, an appellate court may find manifest error or clear wrongness even in a credibility determination. Rosell v. ESCO, 549 So.2d at 844-45.
In the instant case, a review of all of the testimony and documentary evidence in the record convinces us that a reasonable factual basis exists for the jury's determination that the leases were not sold by Jolin and Blanchard on April 6, 1989, and the record does not support that this finding is clearly wrong. As such, this finding cannot be reversed on appeal.
As outlined earlier, the testimony by the parties to the sale conflicted as to whether the parties intended to sell the leases in the April 6, 1989, transaction. The jury apparently determined that Blanchard's version of the transaction, which was corroborated by the testimony of Pitre, one of the former principals of Belle Pass, as well as other witnesses, was more credible than the version presented by Belle Pass and Guidry. After carefully reviewing the entire record, including all of the testimony and documentary evidence, we cannot say that the jury's evaluations of credibility and inferences of fact were unreasonable. Because there are two permissible views of the evidence, namely the version espoused by Belle Pass and Guidry and the version espoused by Jolin and Blanchard, under the clear wording of Stobart, the factfinder's choice between them cannot be clearly wrong. Therefore, they cannot be disturbed upon review. These assignments of error are without merit.

JUDGMENT NOTWITHSTANDING THE VERDICT OR, ALTERNATIVELY, NEW TRIAL

(Assignment of Error No. 3)
Belle Pass and Guidry contend that the trial court erred in refusing to grant Guidry's motion for judgment notwithstanding the verdict on the issue of whether a sale of the leases occurred. Belle Pass and Guidry reason that the jury's verdict that Jolin had not sold the leases on April 6, 1989, was clearly erroneous and was not supported by the record and that, under such circumstances, a judgment notwithstanding the verdict would have been proper. Alternatively, Belle Pass and Guidry contend that the trial judge erred in failing to grant a new trial in that the jury's verdict was contrary to the law and the evidence with regard to whether a sale of the leases occurred.

A. JNOV.
In ruling on a motion for judgment notwithstanding the verdict (JNOV) under LSA-C.C.P. art. 1811, the trial court is required to employ the following legal standard: A JNOV should be granted only if the trial court, after considering the evidence in the light most favorable to the party opposed *492 to the motion, finds it points so strongly and overwhelmingly in favor of the moving party that reasonable persons could not arrive at a contrary verdict on that issue. Petitto v. McMichael, 588 So.2d 1144, 1147 (La.App. 1st Cir.1991), writ denied, 590 So.2d 1201 (La.1992); Barnes v. Thames, 578 So.2d at 1169; Lilly v. Allstate Insurance Company, 577 So.2d 80, 83 (La.App. 1st Cir.1990), writ denied, 578 So.2d 914 (La.1991). If there is substantial evidence opposed to the motion of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motion must be denied. Petitto v. McMichael, 588 So.2d at 1147; Barnes v. Thames, 578 So.2d at 1169. Stated more simply, a trial court can grant a JNOV only when a jury's verdict is one which reasonable people could not have rendered; if reasonable persons could have arrived at the same verdict given the evidence presented to the jury, then a JNOV is improper. Lilly v. Allstate Insurance Company, 577 So.2d at 83.
In considering a motion for JNOV, the trial court must construe all evidence and reasonable inferences to be made therefrom in favor of the party opposed to the motion. Petitto v. McMichael, 588 So.2d at 1147. Additionally, in applying this standard, the court cannot weigh the evidence, pass on the credibility of witnesses, or substitute its judgment of the facts for that of the jury. Petitto v. McMichael, 588 So.2d at 1147; Barnes v. Thames, 578 So.2d at 1169.
The standard to be applied by the appellate courts in reviewing the grant or denial of a JNOV is whether the trial court's findings in rendering the JNOV were manifestly erroneous. Gibson v. Bossier City General Hospital, 594 So.2d 1332, 1336 (La. App. 2nd Cir.1991); Petitto v. McMichael, 588 So.2d at 1147; Barnes v. Thames, 578 So.2d at 1169.
Considering all of the evidence, as set forth earlier, and the reasonable inferences to be made therefrom in favor of Jolin and Blanchard, we cannot say that the trial judge was manifestly erroneous in refusing to grant Belle Pass's and Guidry's motion for JNOV. The jury's verdict is one which reasonable people could have rendered. Reasonable persons could have arrived at the same verdict given the evidence presented to the jury. As such, a JNOV was improper. This assignment of error is without merit.

B. NEW TRIAL.
LSA-C.C.P. art. 1972 provides as follows:
A new trial shall be granted, upon contradictory motion of any party, in the following cases:
(1) When the verdict or judgment appears clearly contrary to the law and the evidence.
(2) When the party has discovered, since the trial, evidence important to the cause, which he could not, with due diligence, have obtained before or during the trial.
(3) When the jury was bribed or has behaved improperly so that impartial justice has not been done.
In addition to the above, a discretionary ground for a new trial is set forth in LSA-C.C.P. art. 1973, which authorizes a trial court to grant a new trial in any case if there is good grounds therefor. Garrett v. Universal Underwriters, 586 So.2d 727, 729 (La. App. 3rd Cir.1991).
The motion for new trial requires a less stringent test than for a JNOV in that such a determination involves only a new trial and does not deprive the parties of their right to have all disputed issues resolved by a jury. Gibson v. Bossier City General Hospital, 594 So.2d at 1336. In a motion for new trial, the trial judge is free to evaluate the evidence without favoring either party; he may draw his own inferences and conclusions and may evaluate credibility of the witnesses to determine if the jury has erred in giving too much credence to an unreliable witness. Smith v. American Indemnity Insurance Company, 598 So.2d 486, 493 (La.App. 2nd Cir.), writ denied, 600 So.2d 685 (La.1992); Petitto v. McMichael, 588 So.2d at 1149.
In such a posture, a trial court may deny a motion for JNOV (where all of the evidence must be viewed in the light most favorable to the opposing party) and grant a motion for new trial because the verdict is *493 contrary to the law and the evidence (where the trial judge can make his own inferences and credibility determinations). See Pellerin v. Tudor Construction Company, 414 So.2d 403, 406 (La.App. 1st Cir.), writ denied, 420 So.2d 455 (La.1982).
The trial judge has much discretion in determining whether to grant a motion for new trial. LSA-C.C.P. art. 1971. The denial of a motion for new trial should not be reversed unless there has been an abuse of that discretion. Gibson v. Bossier City General Hospital, 594 So.2d at 1336.
In the instant case, Belle Pass and Guidry contend that the jury's verdict was contrary to the law and the evidence with regard to whether a sale of the leases occurred and that the trial judge erred in failing to grant a new trial. In denying the new trial, the trial judge apparently determined that the jury's verdict was not contrary to the law and the evidence. We have carefully reviewed the evidence in this case, and we cannot say that the jury's finding that there was no sale of the leases was clearly wrong. Therefore, under the well-settled standard of review of facts to which this court must adhere, the verdict and judgment was not clearly contrary to the law and the evidence. Garrett v. Universal Underwriters, 586 So.2d at 729. Therefore, the trial judge did not abuse his discretion in refusing to grant a new trial. This assignment is without merit.

NO CAUSE OF ACTION

(Assignment of Error No. 10)
Belle Pass and Guidry contend that the trial court erred in refusing to grant their exception pleading the objection of no cause of action with regard to the issue of reformation in that Jolin and Blanchard failed to allege that Caillouet consented to the leases.
The peremptory exception pleading the objection of no cause of action is a procedural device used to test the legal sufficiency of the petition. International Association of Heat and Frost Insulators and Asbestos Workers Local No. 53 v. Poche, 593 So.2d 411, 413 (La.App. 1st Cir.1991), writ denied, 594 So.2d 878 (La.1992). In making the determination, all well-pleaded facts in the petition must be accepted as true, and no reference can be made to extraneous supportive or controverting evidence. The court must then determine whether the law affords any relief to the plaintiff if the factual allegations of the petition are proven at trial. Perque Floor Covering of New Orleans, Inc. v. L. Cambre Enterprises, Inc., 593 So.2d 407, 410 (La.App. 1st Cir.1991). Any reasonable doubt concerning the sufficiency of the petition must be resolved in favor of finding that a cause of action has been stated. Jarrell v. Carter, 577 So.2d 120, 123 (La.App. 1st Cir.), writ denied, 582 So.2d 1311 (La.1991); Johnson v. Edmonston, 383 So.2d 1277, 1281-82 (La.App. 1st Cir.1980). For purposes of an exception pleading the objection of no cause of action, the allegations of fact must be accepted as true. See Perque Floor Covering of New Orleans, Inc. v. L. Cambre Enterprises, Inc., 593 So.2d at 410.
In the instant case, Belle Pass and Callais filed a suit for breach of warranty, redhibition, and damages against Jolin and Blanchard arising out of the sale of movable property and the purported sale and mortgage of the leases. In a reconventional demand, Jolin and Blanchard alleged reformation of the contract and specifically, that, in executing the sale and mortgage, Belle Pass, Guidry, and Pitre never acquired any lease rights owned by Jolin or Blanchard, and that it was the intent of the parties that Jolin would retain the Caillouet leases.
Assuming that these factual allegations are true and could be established at trial, the law clearly affords a remedy. We have thoroughly reviewed the reconventional demand of Jolin and Blanchard and find that it sufficiently sets forth a cause of action for reformation and that the trial court did not err in overruling the exception pleading the objection of no cause of action.

REDHIBITION CLAIMS

(Assignment of Error No. 13)
Belle Pass and Guidry contend that the trial court erred in failing to find that the docking facility was defective and that such *494 defects warranted rescission of the sale. Belle Pass and Guidry reason that the testimony clearly showed that there were substantial hidden defects in the design and construction of the docks, which were not discoverable by mere inspection, and that they would not have purchased the docking facility had they known of the defects.
Redhibition is the avoidance of a sale on account of some vice or defect in the thing sold, which renders it either absolutely useless, or its use so inconvenient and imperfect, that it must be supposed that the buyer would not have purchased it, had he known of the vice. LSA-C.C. art. 2520; Harper v. Coleman Chrysler-Plymouth-Dodge, Inc., 510 So.2d 1366, 1368 (La.App. 3rd Cir.1987); Coffey v. Cournoyer Oldsmobile-Cadillac-GMC, Inc., 484 So.2d 798, 800 (La.App. 1st Cir.1986); Ezell v. General Motors Corporation, 446 So.2d 954, 956 (La.App. 3rd Cir.), writ denied, 449 So.2d 1350 (La.1984). A purchaser may also request a reduction in the price of the thing where the lack of quality of the thing purchased is not of such importance as to warrant complete avoidance of the sale. LSA-C.C. art. 2542; Coffey v. Cournoyer Oldsmobile-Cadillac-GMC, Inc., 484 So.2d at 800. Both actions are subject to the same burden of proof. Coffey v. Cournoyer Oldsmobile-Cadillac-GMC, Inc., 484 So.2d at 800.
In order to establish a prima facie case, a purchaser must show that a non-apparent defect existed at the time of the sale. LSA-C.C. art. 2520 and 2530; Ezell v. General Motors Corporation, 446 So.2d at 956. The term "defect," as contemplated in article 2520, means a physical imperfection or deformity or a lacking of the necessary components or level of quality. Harper v. Coleman Chrysler-Plymouth-Dodge, Inc., 510 So.2d at 1369; Ezell v. General Motors Corporation, 446 So.2d at 956. Apparent defects are those defects which the purchaser might have discovered by simple inspection, and they are not redhibitory defects. LSA-C.C. art. 2521.
Once the purchaser establishes a prima facie case, the burden shifts to the seller to show that he can somehow escape liability. Ezell v. General Motors Corporation, 446 So.2d at 956. Whether or not a thing is defective is a factual determination to be made by the trier of fact, which determination will not be set aside on appeal absent manifest error. Harper v. Coleman Chrysler-Plymouth-Dodge, Inc., 510 So.2d at 1369.
In the instant case, the evidence presented at trial consisted of the testimony of Guidry, Callais, Pitre, Bob Faulk, Blanchard, and Johnson, as well as the expert testimony of Donald Pertuit and J.G. Babcock.
Richard Guidry testified that, prior to the sale, he walked the dock four to five times, but that he did not inspect it. During one of these "walks," Guidry observed a "cave-in" or damage to the dock. Guidry was informed by Pitre and Blanchard that the damage was caused by a boat which had struck the dock. Guidry further testified that Blanchard had represented that the Jolin docks were the best docks at Fourchon and that he had built the docks himself. Guidry testified that, when Belle Pass purchased the docks, he was aware that repairs were needed. However, other than this damage, Guidry did not observe any holes or problems with the bulkhead or docks. Nor did Guidry observe any problems with the crane pads. After the sale, one of the large crane pads developed a large crack in the center of the pad, which made it virtually impossible to use.
Harold Callais testified that, prior to the sale, he walked along the dock with Guidry and Pitre. According to Callais, at that time, the dock and bulkhead appeared to be in good condition and that he did not observe any problems with them. Callais also testified that he observed the damaged crane pad near the failed bulkhead and that Pitre advised him and Guidry that a large boat had struck the bulkhead, causing it to fail. Callais testified that approximately sixty to seventy-five feet of the bulkhead had failed. The other imperfections Callais observed were described as superficial things, which could be easily repaired or cleaned. However, other than the area where the dock and bulkhead had been struck by the boat, Callais *495 observed no other sink holes or other signs of failure.
Callais testified that Blanchard represented the docks as the "best" at Fourchon and that Blanchard boasted that he had constructed the docks himself. Callais testified that, since the sale, portions of the dock have failed completely. According to Callais, Belle Pass has been warned by their engineering consultant that they would have to employ several safety features to address the operational problems caused by the failure of the docks. Additionally, although one of the large crane pads failed prior to the sale, another has failed since the sale. Callais testified that, if he had known about the problems with the dock, he would have never purchased the docks or the equipment.
Elmo Pitre testified that at the time of the sale he was aware of both the problems with the dock and the cracks in the crane pad. Pitre testified that he was not disappointed with the condition of the docks after the sale and that the docks were in a useable condition at the time of the sale. Pitre noted that, when he was the general manager, he was fully aware that the docks needed proper maintenance. At one point, Pitre began repairs to the bulkhead and removed about 100 feet of the bumper system on the west end of the dock. Pitre estimated the costs to repair and submitted them to Callais and Guidry, who advised that the repairs should be delayed if possible. When he left the employ of Belle Pass, the repairs had still not been performed. Pitre adamantly testified that, prior to February, 22, 1990, there had been no complaints about the condition of the docks or the equipment.
Bob Faulk, general manager of Belle Pass since November, 1989, testified that, when he began working for Belle Pass, he inspected the facility to familiarize himself with the condition of the bulkhead. Other than the one hole in the bulkhead, Faulk did not observe any problems with the docks. Faulk further testified that, during his tenure as general manager, Belle Pass performed a lot of maintenance on the docking facility. According to Faulk, Belle Pass replaced some of the walkway, repaired the large crane pad, installed some new waterlines, and repaired water meters. Additionally, in connection with Faulk's testimony, Belle Pass showed a video tape of the dock facility. The tape showed various holes in the dock, which Faulk testified were not present when he began working for Belle Pass. Faulk testified that the structure for the crew boat pad was in a poor condition and that Belle Pass had to replace a portion of it. Faulk also noted that, in the summer of 1990, there had been several areas along the dock where the crane pads were sinking because the tiebacks had broken and had drifted away from the dock. The crane pad eventually became inoperable. Faulk also testified regarding several sinkholes in the dock and described how certain areas of the bulkhead eventually broke. Faulk testified that several customers left the dock or have refused to use the dock because of the condition of the premises.
Donald Pertuit, a civil engineer with expertise in the design and construction of bulkheads and docks, testified on behalf of Belle Pass. In 1990, Pertuit made an inspection of the docks. During the course of this inspection, Pertuit performed some excavation work to determine the number of tiebacks and type of construction and placement of the tiebacks. Pertuit excavated approximately 10% of the anchors. Pertuit testified that the bulkhead was in a complete state of failure, which was primarily due to the construction and design of the facility. Pertuit opined that the entire anchorage system was improper. In fact, according to Pertuit, the dock was a failure from an engineering point of view since its inception. Pertuit testified that this type of defect is not easily observed and that one would have to inspect the premises closely to make such an observation. Pertuit attributed the failure of the bulkhead to an unknowledgeable builder or a refusal to expend the funds necessary for proper construction. In order to correct the problems with the bulkhead, Pertuit was of the opinion that the entire dock and bulkhead would have to be reconstructed.
On cross-examination, Pertuit acknowledged that he had been engaged by Belle Pass to make an inspection in March, 1989 (prior to the date of the sale). Pertuit advised *496 Callais, Faulk, and counsel for Callais of his findings and subsequently presented a written report of his findings. Pertuit testified that Callais, Guidry, and Pitre would have had the report prior to the date on which they purchased the property. However, on redirect examination, Pertuit subsequently corrected his earlier testimony and stated that his inspection and the report were actually prepared in March, 1990 (after the date of the sale), and that his earlier testimony was in error.
Pertuit acknowledged that maintenance is critical to a docking facility. He also acknowledged that the dismantling of the dock's bumper system and permitting large boats to use the dock without the bumper system would constitute abuse of the docks. However, Pertuit testified that the bumper system was not the cause of the failure of the docks. Pertuit also testified that, assuming none of the original design conditions change, the life of docks in lower Lafourche Parish is fifteen to twenty years. According to Pertuit, the Jolin docks were built in 1975.
Joseph Blanchard testified that he began building the dock facility in 1973, and that between that time and the time he sold the facility to Belle Pass in 1989, he performed maintenance and repairs to the facility on a regular basis. During the last several years, Blanchard had spent about $5,400.00 per month in repair and maintenance of the docking facility. Blanchard acknowledged that, at the time of the sale to Belle Pass, an eighty-foot portion of the dock had caved in, but that this damage was plainly visible on April 6, 1989. Blanchard testified that he had even discussed with Pitre how the area could be repaired.
Michael Johnson, who worked as an accountant for Blanchard and Jolin, testified that between April, 1989 (the date of the sale), and October, 1991, Belle Pass had gross receipts totalling $3,600,209.00. Johnson also testified that Belle Pass's financial statements reveal that between April, 1989, and March, 1990, Belle Pass spent a total of $5,933.00 on maintenance of the dock. Between April and December of 1990, Belle Pass spent approximately $4,040.00 on dock maintenance. Johnson also testified that from January to October of 1991, Belle Pass spent only $1,945.00 on dock maintenance. Johnson concluded that between the date of the sale and October, 1991, Belle Pass spent only $11,918.00 on maintenance of the dock facility. However, Johnson acknowledged that these figures did not include any sums Belle Pass may have paid to its own employees, because the figures he provided addressed only the amounts paid to outside contractors.
J.G. Babcock, a certified professional marine surveyor, testified on behalf of Jolin and Blanchard. Babcock testified that a marine surveyor examines boats and marine installations to determine conditions and valuations. If accidents have occurred, a marine surveyor may determine the cause of the accident and estimate the cost to repair the damage. Babcock testified that he was hired by Jolin to inspect and evaluate the dock facility at Pass Fourchon on October 29, 1991. At that time, Babcock found the facility in poor condition, which he attributed to lack of maintenance. Babcock also observed that an eighty-foot section of the dock had collapsed. Other than this area of erosion, Babcock testified that he did not observe any other area of erosion or collapse. Moreover, Babcock testified that, other than the one section, the dock had not failed. However, Babcock acknowledged that he had observed a cracked crane pad. Additionally, Babcock observed that a portion of the dock's bumper system had been removed. Babcock testified that the worst thing he observed about the docks in October, 1991, was the total lack of maintenance. Babcock opined that maintenance is very important because it is what holds the facility together.
In the instant case, after hearing the evidence, the jury concluded that the dock facility was not defective. In answer to Jury Interrogatory # 7, the jury replied negatively to the following question:
Was the bulkhead sold by Jolin, Inc. and Joseph Blanchard, Jr. in the sale of April 6, 1989, to Belle Pass Terminal, Inc., Richard Guidry, and Elmo Pitre, Jr. defective on the date of the sale?
This finding is a factual determination, which cannot be set aside on appeal absent *497 manifest error. After carefully reviewing the entire record in this matter under the standard of review espoused in Stobart, we find that a reasonable factual basis exists for this finding. As such, the trial court determination that the dock facility is not defective must be upheld. This assignment of error is without merit.

RECOGNITION OF MORTGAGE
In answer to the appeal, Blanchard and Jolin request that the trial court judgment be modified to expressly recognize their mortgage and vendor's privilege upon the property described in the sale and mortgage.
Belle Pass executed a note and sale and mortgage in favor of Jolin with regard to the following described property:
Any and all assets and improvements located on properties owned, leased, or rented by Jolin, Inc., Fourchon Docks, Inc. and Joe Blanchard in Fourchon, Louisiana.
The sale and mortgage also specifically provided that the vendor reserved the lien and privilege accorded him by law, namely the vendor's lien, and that the purchaser specifically mortgaged and hypothecated under the Pact de non alienando the above described property. The note was paraphed "Ne Varietur" for identification with the sale and mortgage.
Under LSA-R.S. 9:5392, a mortgage continues "when the mortgagee has reduced to judgment any obligation thereby secured, and shall secure such judgment without interruption, whether it expressly recognizes the mortgage, except to the extent that the judgment expressly provides to the contrary."[11]
When Jolin filed its suit on the promissory note, the petition specifically prayed for recognition of the mortgage and vendor's lien and for the issuance of a writ of sequestration seizing the property described in the sale and mortgage. However, the trial court judgment failed to recognize the mortgage and vendor's lien. The sale and mortgage complied with the requirements for establishing conventional mortgages (LSA-C.C. 3290 et seq., now LSA-C.C. art. 3287 et seq., and the sale with mortgage gave rise to a vendor's lien and privilege under LSA-C.C. art. 3249. Moreover, Jolin complied with the requirements relative to the issuance of a writ of sequestration.
Therefore, Jolin is entitled to have the judgment of the trial court modified to recognize these rights.

CONCLUSION
For the foregoing reasons, the judgment of the trial court is amended as follows:
IT IS FURTHER ORDERED, ADJUDGED, AND DECREED, that a vendor's lien and privilege and special mortgage is hereby recognized in favor of Jolin, Inc., in accordance with the sale and mortgage, dated April 6, 1989, before John C. Orgeron, Notary Public, and upon the following described property:
Any and all assets and improvements located on properties owned, leased, or rented by Jolin, Inc., Fourchon Docks, Inc., and Joe Blanchard in Fourchon, Louisiana.
IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that the sequestration, made executory in the Judgment of February 5, 1991, be, and is hereby, maintained.
In all other respects, the judgment of the trial court is affirmed. Costs of this appeal are assessed against Belle Pass and Guidry.
AMENDED AND, AS AMENDED, AFFIRMED.
NOTES
[1] Pursuant to a federal court judgment, Milchem's rental payments under its sublease had been accelerated, and Milchem's lease had been prepaid.
[2] On February 22, 1990, L. Milton Cancienne, Jr., as attorney for Jolin and Blanchard, sent a certified letter to Belle Pass, advising Belle Pass that the monthly payments on the $2 million note were due on the 15th day of each month and that any payment received after that date would be considered delinquent, entitling Jolin and Blanchard to accelerate the remaining payments on the note and to foreclose on the mortgage.

In the letter of February 22, 1990, Cancienne also advised Belle Pass of its default on the mortgage for failure to provide insurance on the mortgaged property and requested that the default be remedied immediately.
[3] Jolin and Blanchard alleged that, in executing the sale and mortgage, Belle Pass, Guidry, and Pitre never acquired any lease rights owned by Jolin or Blanchard and that it was the intent of the parties that Jolin retain the Caillouet leases.
[4] Jolin and Blanchard alleged that Callais notified Caillouet of the alleged sale of the leases in violation of the prohibition contained in Jolin's and Blanchard's lease with Caillouet. Jolin and Blanchard further alleged that Callais made an offer to Caillouet to lease the property directly from Caillouet and attempted to interfere with the agreements between Jolin, Blanchard, and Caillouet.
[5] Jolin and Blanchard filed petitions for appeal from the trial court judgments of October 4, 1991, and November 5, 1991, granting Callais' and Pitre's exceptions pleading the objection of no cause of action. These matters were previously disposed of by this court in Belle Pass Terminal, Inc. v. Jolin, Inc., 618 So.2d 1076 (La.App. 1st Cir.), writ denied, 626 So.2d 1172 (La.1993), and are not before us in this appeal.
[6] A writ of sequestration was issued on January 22, 1991. By judgment dated February 5, 1991, the trial court refused to dissolve the writ of sequestration previously issued. However, the court ordered the keeper to apply all revenue of the subject property first to the costs of operation of the corporation, then to deposit the remainder with the sheriff. Pursuant to an application for supervisory writs, under docket number 91 CW 0259, on March 18, 1991, this court determined that the trial court did not abuse its discretion in issuing the writ of sequestration. However, this court granted the writ application insofar as the trial court judgment sequestered all revenue of the subject property. This court ordered that any revenue derived solely from the rental or lease of movable property was not subject to the writ of sequestration. The subsequent application for supervisory writs to the Louisiana Supreme Court was denied on April 4, 1991, under docket number 91-CC-0717.
[7] In response to this answer, Callais filed a motion to dismiss and, alternatively, an answer to the appeal, asserting that the answer filed by Jolin and Blanchard was untimely. Pursuant to joint motion of Jolin, Blanchard, and Callais, by order dated June 17, 1993, the answer of Jolin and Blanchard was modified and revised to strike the request that the judgment be reversed, modified, or amended to render judgment in favor of Jolin and Blanchard and against Callais. The order also dismissed Callais's motion to dismiss as moot. Therefore, these issues are not before us on appeal.
[8] We note that the judgment of eviction was subsequently reversed by this court in Caillouet Land Corporation v. Jolin, Inc., 602 So.2d 1144, 1147 (La.App. 1st Cir.1992).
[9] The Milchem offer was subject to numerous conditions, among which was the receipt of written consent of Caillouet in a form satisfactory to Milchem.
[10] Milchem was prepaid on their lease until May 1, 1992.
[11] LSA-R.S. 9:5392 was amended by Acts 1991, No. 377, § 3, effective January 1, 1992.