# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 12-157

**JUDY CROOKS**

**VERSUS**

**SOUTHWEST LOUISIANA HOSPITAL ASSOC. D/B/A LAKE CHARLES**

**MEMORIAL HOSPITAL**

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 2003-6258
HONORABLE G. MICHAEL CANADAY, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**JOHN D. SAUNDERS**
**JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of John D. Saunders, Billy Howard Ezell, and Phyllis M. Keaty, Judges.

**REVERSED AND RENDERED.**

**Erin McCall Alley**
**Baggett, McCall & Burgess**
**3006 Country Club Road**
**Lake Charles, LA 70606**
**(318) 478-8888**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
      **Judy Crooks**

**Adrien G. Busekist**
**Watson, Blanche, Wilson & Posn**
**P. O. Drawer 2995**
**Baton Rouge, LA 70821-2995**
**(225) 387-5511**
**COUNSEL FOR DEFENDANTS/APPELLANTS:**
  **Southwest Louisiana Hospital  Assoc.**
  **Lake Charles Memorial Hospital**
  **Southwest Louisiana Hospital  Assoc.**

**SAUNDERS, Judge.**

This is a personal injury case wherein the plaintiff contends that she suffered damages from a fall through a defective sofa bed at Lake Charles Memorial Hospital on December 21, 2002. The Defendant contends that the Plaintiff failed to carry her burden to prove that this accident occurred or, alternatively, that she was actually injured by falling through the sofa bed.

A jury trial was conducted. Prior to submitting the case to the jury, the trial judge granted a directed verdict, leaving the jury to award damages. After the jury awarded damages, the trial judge granted the plaintiff's motion for a judgment notwithstanding the verdict and increased the amount awarded to the plaintiff.

Defendants appeal. We reserve the trial judge's directed verdict, find the record before us to be complete, conduct a *de novo* review of the record, and render judgment in favor of the plaintiff.

## FACTS AND PROCEDURAL HISTORY:

On December 21, 2002, Judy Crooks (Crooks) was visiting her grandson, Shannon, at Lake Charles Memorial Hospital (LCMH) where he had been admitted to the pediatric ward. Mrs. Crooks alleges that she was injured when she fell through the mattress and frame of a foldout sofa bed in Shannon's hospital room. Shannon's mother, Cheranne Johnson, witnessed the alleged accident.

According to Crooks, she fell through the sofa bed because several springs were missing along the foot of the sofa bed. The purpose of these springs is to connect the underlying tarp to the frame. She contends that after being unfolded, the mattress laid across the frame and appeared to be properly supported, as it was held in place by a velcro strap. However, without the springs to hold the tarp to the frame, the velcro strap did not support her when she sat down. Thus, she fell through the sofa bed onto the ground and was injured.

After she fell through the sofa bed, Crooks reported the problem with the sofa bed to a nurse on duty who came into the room to see about Shannon. However, despite advising the nursing staff, no hospital personnel removed the sofa bed from the room during their stay. When Crooks left the hospital the next day, Crooks pushed the mattress outside the door to remind the hospital staff that the sofa bed was broken.

Crooks contends that she sustained injuries to her back in the fall through the sofa bed that ultimately required surgery. She brought a claim against LCMH alleging liability pursuant to La.Civ.Code art. 2317.1. A trial was held the week of May 16, 2011, which resulted in the trial court granting a directed verdict on the issues of liability, causation, and comparative fault. Thereafter, the matter was submitted to the jury and the jury awarded $115,000.00 in past medical expenses but awarded no other damages. The trial court then granted Crooks' motion for judgment notwithstanding the verdict and reduced the jury's award of $115,000.00 to $70,000.00, awarded $12,000.00 in future medical expenses, $150,000.00 in past, present, and future physical pain and suffering, $15,000.00 in past, present, and future mental pain and anguish, and $30,000.00 in past, present, and future loss of enjoyment of life. Both Crooks and LCMH raised assignments of error on appeal.

## LCMH'S ASSIGNMENTS OF ERROR:

1. The trial court erred in granting directed verdicts as to the issues of liability, causation, and comparative fault.

2. The trial court erred in granting a judgment notwithstanding the verdict as to the issue of damages.

3. The trial court erred in failing to grant LCMH's motion for new trial.

4. The trial court erred in failing to exclude the expert testimony of Michael Frenzel as to causation of the alleged injury.

2

5.      The trial court erred in excluding numerous excerpts of the deposition testimony of Cheranne Johnson/failing to admit the entirety of Cheranne Johnson's deposition testimony.

## CROOKS' ASSIGNMENT OF ERROR:

1.      The trial court erred in reducing the award for past medical expenses.

## ASSIGNMENT OF ERROR LCMH NUMBER ONE:

LCMH contend in its first assignment of error that the trial court erred in granting directed verdicts as to the issues of liability, causation, and comparative fault. We find merit to this contention.

Louisiana Code of Civil Procedure Article 1810 states:

> A party who moves for a directed verdict at the close of the evidence offered by an opponent may offer evidence in the event that the motion is not granted, without having reserved the right so to do and to the same extent as if the motion had not been made. A motion for a directed verdict that is not granted is not a waiver of trial by jury even though all parties to the action have moved for directed verdicts. A motion for a directed verdict shall state the specific grounds therefor. The order of the court granting a motion for a directed verdict is effective without any assent of the jury.

This court, in *Hebert v. BellSouth Telecommunications, Inc.*, 01-223, pp. 4-5 (La.App. 3 Cir. 6/6/01), 787 So.2d 614, 617, *writ denied*, 01-1943 (La. 10/26/01), 799 So.2d 1145, stated the following:

> The applicable standard of review for [a motion for directed verdict] is found in *Busby v. St. Paul Insurance Co.*, 95-2128, pp. 16-17 (La.App. 1 Cir. 5/10/96); 673 So.2d 320, 331, *writ denied*, 96-1519 (La.9/20/96); 679 So.2d 443, which states:
>
>> A trial court has much discretion in determining whether or not to grant a motion for directed verdict. *New Orleans Property Development, Ltd. v. Aetna Casualty and Surety Company*, 93-0692 (La.App. 1st Cir.4/8/94); 642 So.2d 1312, 1315; *Belle Pass Terminal, Inc. v. Jolin, Inc.*, 92-1544 and 92-1545 (La.App. 1st Cir.3/11/94); 634 So.2d 466, 478, *writ denied*, 94-0906 (La.6/17/94); 638 So.2d 1094; *Barnes v. Thames*, 578 So.2d 1155, 1162 (La.App. 1st Cir.), *writ denied*, 577 So.2d 1009 (La.1991). A motion for directed verdict is appropriately

3

granted in a jury trial when, after considering all evidentiary inferences in the light most favorable to the movant's opponent, it is clear that the facts and inferences are so overwhelmingly in favor of the moving party that reasonable men could not arrive at a contrary verdict. *New Orleans Property Development, Ltd.*, 642 So.2d at 1315; *Belle Pass Terminal, Inc.*, 634 So.2d at 478; *Barnes*, 578 So.2d at 1162. However, if there is substantial evidence opposed to the motion, that is, evidence of such quality and weight that reasonable and fair-minded jurors in the exercise of impartial judgment might reach different conclusions, the motion should be denied, and the case submitted to the jury. *New Orleans Property Development, Ltd.*, 642 So.2d at 1315; *Belle Pass Terminal, Inc.*, 634 So.2d at 478.

On appeal, the standard of review for directed verdicts is whether, viewing the evidence submitted, the appellate court concludes that reasonable people could not reach a contrary verdict. *New Orleans Property Development, Ltd.*, 642 So.2d at 1315; *Belle Pass Terminal, Inc.*, 634 So.2d at 478. Furthermore, the propriety of a directed verdict must be evaluated in light of the substantive law underpinning the plaintiff's claims. *New Orleans Property Development, Ltd.*, 642 So.2d at 1315; *Belle Pass Terminal, Inc.*, 634 So.2d at 478.

In the case before us, the trial court granted Crooks' motion for directed verdict as to the issues of liability, causation, and comparative fault. Crooks' cause of action against the Defendants is based on La.Civ.Code art. 2317.1. A requirement to recover under this article is that Crooks must first prove that the incident causing her harm actually occurred.

Crooks and Johnson testified that Crooks fell through the sofa bed and onto the floor. However, LCMH called two nurses who were on duty during the time of Crooks' alleged incident, Ms. Shay Matt and Ms. Rika Amentor. They testified: (1) that no patient or patient's visitor reported a fall through a sofa bed on the night of December 21, 2002, or the following morning; (2) that if someone had reported such an unusual fall, it would have been remembered, and (3) that if such a fall had been reported, they would have written an incident report, referred the person to

4

the emergency room, and contacted maintenance to have the sofa bed removed from the room.

Moreover, LCMH has two witnesses testify that each looked at the sofa bed after Crooks reported the incident. Both stated that upon inspection of the sofa bed, that they did not observe any springs missing, nor could they see how this alleged incident could have transpired.

In viewing the evidence in a light most favorable to the nonmoving parities, i.e. LCMH, the testimonies of Matt and Amentor provide a basis for a reasonable and fair-minded juror, in the exercise of impartial judgment, to possibly reach a different conclusion than that an incident occurred. Both nurses on duty the night in question had no recollection of an incident transpiring and both claim that had such an incident occurred, they would remember. Further, there was no written incident report, Crooks was not referred to the emergency room, and there was no record of maintenance removing the sofa bed from the room. Accordingly, given the applicable standard of review, the trial court's granting of a motion for directed verdict in favor of Crooks as to the issues of liability, causation, and comparative fault was in error. As such, we reverse the judgment of the trial court in its entirety.

**ASSIGNMENTS OF ERROR LCMH NUMBERS TWO THROUGH FIVE; ASSIGNMENT OF ERROR CROOKS:**

Our finding in Assignment of Error Number One pretermits the LCMH's remaining assignments of error as well as Crooks' lone assignment of error. Crooks was not entitled to a directed verdict on the issues of liability, causation, and comparative fault. Thus, a determination of whether the trial court property granted a judgment notwithstanding the verdict on the issue of damages, or whether the trial court should have granted the LCMH's motion for a new trial, or whether the trial court erred in reducing the award for past medical expenses is

unnecessary. LCMH, in assignment of error number one prayed for this court to conduct a *de novo* review of the record should we find that the trial court erred in granting directed verdicts. We have found it had. Thus, our next step is to determine whether to remand the case for further proceedings or to conduct a *de novo* review of the record as prayed for my LCMH.

*Remand or Review:*

"The appellate court shall render any judgment which is just, legal, and proper upon the record on appeal." La.Code Civ.P. art. 2164. The Louisiana Supreme Court, in *Gonzales v. Xerox Corp.*, 254 La. 182, 320 So.2d 163, 165–66 (1975) (citations and footnote omitted), stated the following:

> While the trial court remains the original forum for resolving factual and legal issues, the Louisiana Constitution expressly extends the jurisdiction of appellate courts in civil cases to the review of facts as well as law. . . .
>
> In addition to the constitutional authority, and consistent with it, there is a very practical consideration which encourages our appellate courts to exercise their jurisdiction to review factual findings: judicial economy. When the entire record is before the appellate court, remand for a new trial produces delay of the final outcome and congestion of crowded dockets while adding little to the judicial determination process. Although the appellate court does not gain the benefit of personally viewing the witnesses, it does have a complete record and the constitutional authority to decide.

In the case before us, neither Crooks nor LCMH contend that any relevant evidence is outstanding. Further, neither suggests that the record before this court is incomplete. Accordingly, in the interest of judicial efficiency, we will grant LCMH's prayer that this court conduct a *de novo* review of the record and fully adjudicate this matter.

## DISCUSSION OF THE MERITS:

Crooks' action against LCMH is under La.Civ.Code art. 2317.1. According to Crooks, LCMH failed to provide a safe environment in the hospital, failed to

maintain the sofa bed in a safe condition, failed to inspect the sofa bed, and failed to warn her of the unsafe condition when it knew or should have known of the unsafe condition of the sofa bed.

Louisiana Civil Code Article 2317.1 states:

> The owner or custodian of a thing is answerable for damage occasioned by its ruin, vice, or defect, only upon a showing that he knew or, in the exercise of reasonable care, should have known of the ruin, vice, or defect which caused the damage, that the damage could have been prevented by the exercise of reasonable care, and that he failed to exercise such reasonable care. Nothing in this Article shall preclude the court from the application of the doctrine of res ipsa loquitur in an appropriate case.

This court, in *Riggs v. Opelousas General Hospital Trust Authority*, 08-591, p. 4 (La.App. 3 Cir. 11/5/08), 997 So.2d 814, 817 stated that in order to prevail under La.Civ.Code art. 2317.1, a plaintiff must prove:

> (1) that the thing which caused the damage was in the defendant's custody or control, (2) that it had a vice or defect that presented an unreasonable risk of harm, (3) that the defendant knew or should have known of the vice or defect, (4) that the damage could have been prevented by the exercise of reasonable care, and (5) that the defendant failed to exercise such reasonable care. If the plaintiff fails to provide proof any one of these elements, his/her claim fails.

*Prerequisite Fact Finding – Did an accident occur?*

Before this court can conduct any analysis under La.Civ.Code art. 2317.1, we must first determine facts surrounding this alleged incident. Crooks, first, has the burden to prove that an accident occurred. Crooks testified that on December 21, 2002, while she was visiting her grandchild in the hospital, she sat on the end of the sofa bed provided by the hospital for patient's visitors to use. According to Crooks, when she sat on the sofa bed, she fell through the bed and to the ground. Upon inspecting the bed, Crooks discovered that the springs that would support a person sitting on the end of the sofa bed were missing. Crooks testified that she

notified the hospital's staff of the incident. Crooks' testimony is corroborated by the only eye witness to the accident, her daughter, Cheranne Johnson.

The only evidence in the record that tends to show that no accident occurred is the testimony of nurses Matt and Amentor, who have no independent recollection of such an incident being reported on December 21, 2002. It is clear from the record that Crooks and Johnson's mother/daughter relationship, at some point after the alleged incident, became acrimonious. However, despite the deterioration of their relationship, Johnson has remained consistent in her recollection of the incident where Crooks fell through the sofa bed in the hospital.

The testimony of Crooks and Johnson is direct evidence on the facts surrounding the alleged accident. They claim to have seen the accident or have been in the accident. Crooks also testified that she told the nurse on duty of the incident and placed the mattress outside the room to remind the staff of the sofa bed's unfitness. Conversely, the testimony of nurses Matt and Amentor is indirect. They simply have no recollection of this event being reported. The probative weight of this conflicting evidence is in favor of an accident occurring.

Moreover, as will be discussed below, we find as fact that the springs were missing from the sofa bed on December 21, 2002. The very purpose of these springs was to support a person sitting on the sofa bed. Thus, this fact is supportive of the contention that Crooks fell through the sofa bed.

Finally, the medical records from Crooks' treatment show that she endured an accident that injured her on or about the alleged date. Four different doctors testified that Crooks was indeed injured on or about the alleged date of the accident. Further, these doctors also testified as to Crooks' character in a positive manner. This evidence tends to show that Crooks experienced at least some accident around the alleged date of this incident.

Given the evidence in the record, we find that Crooks has carried her burden to prove that an accident occurred on December 21, 2002, wherein she fell through the sofa bed provided by LCMH.

*Prerequisite Fact Finding – Were the springs missing?*

We next analyze the issue of whether the springs were missing at the foot of sofa bed as claimed by Crooks. Again, Crooks has the burden to prove this fact.

Both Crooks and Johnson contend that they looked at the sofa bed and noticed that the springs that hold the supporting tarp for the sofa bed were missing. This contention is not truly contested in the record, as the Defendants did not inspect the sofa bed until well after the alleged incident. In that inspection, it was discovered that the sofa bed did, in fact, have springs at the foot of the bed holding the support for the mattress. However, according to the testimony of Michael Frenzel, an expert put forth by Crooks, those springs were clearly shiny, new springs not consistent with the rest of the innards of the sofa bed that has rusted over years of use.

It is clear to this court from our inspection of the photographic evidence in the record that the springs on the sofa bed were as described by Frenzel, shiny and new, in comparison to the rest of support system used by the sofa bed. This distinction is dramatic. The springs at the foot of the bed are silver, shiny, and new. The remainder of the innards of the sofa bed are brown, rusted, and old.

Further, Mr. Frenzel testified to the following regarding whether the springs were on the bed at the time of the accident:

Q. Is there any evidence in all of the material you've seen that suggests that there were springs on the bed at the time?

A. No. There are wear patterns, you know. There are some other things we could look at that would suggest that these springs were – the silver springs – the silver springs were not there or were not original

to the bed and not there on the night or afternoon of [December 21, 2002.]

Therefore, we find that on December 21, 2002, when Crooks sat on the sofa bed in her grandchild's hospital room, she fell through the bed due to failure of the support system upholding the mattress. The failure of the support system was due to missing springs used to hold up the support of the mattress.

*Analysis – Part I:*

There is no dispute that the sofa bed "was in the defendant's custody or control." The sofa bed was at all relevant times in LCMH. Thus, clearly Crooks has met her burden to prove this requirement.

*Analysis – Part II:*

It is clear that that the sofa bed had a vice or defect that presented an unreasonable risk of harm. The lack of springs to support one using a sofa bed in a normal manner can reasonably lead to injury. Thus, Crooks has met her burden to prove this element.

*Analysis – Part III:*

We must now determine whether the hospital knew or should have known of the defect. According to the testimony of William Wilkie, director of facilities and safety officer at LCMH, no inspection of the sofa beds was ever conducted by anyone to his knowledge, nor are any such inspections regularly performed by his staff. While this tends to show that the Defendants had no actual knowledge of the defect this particular sofa bed, this does not defeat Crooks' cause of action. Had LCMH exercised reasonable care, i.e. inspect the sofa beds in use in its facility, it would have discovered the defect. Thus, we find that the Defendants should have known of this defect and that Crooks has carried her burden of proof for this element.

*Analysis – Part IV:*

Next, we must determine whether "the damage could have been prevented by the exercise of reasonable care." Clearly, had LCMH performed regular inspection of its furniture, this defect would have been discovered and the damage could have been prevented. As such, we find that Crooks has carried her burden of proof for this element.

*Analysis – Part V:*

Finally, we must determine whether the Defendants "failed to exercise such reasonable care." As stated above, Wilkie testified quite frankly that the hospital did not inspect the sofa beds or any furniture in its facility. Thus, it is apparent that the Defendants failed to exercise reasonable care.

*Causation – Preexisting Conditions*:

Having made a determination that Crooks met the necessary elements under La.Civ.Code art. 2317.1, we must now look to the medical evidence in the record to find what injuries, if any, Crooks endured due to falling through the defective sofa bed. There is no dispute in the medical evidence that Crooks suffered from neck pains prior to the accident. Furthermore, there is no dispute that Crooks underwent two neck surgeries prior to the accident. Finally, there is no dispute that Crooks occasionally suffered from lower back pain.

*Causation – Back Pains*:

Crooks was treated for back pains by her long-time physician, Dr. Fayez Shamieh, a neurologist. When questioned about Crooks' character as a patient, Dr. Shamieh testified to the following:

Q. Has Judy ever given you any reason to think that she was not being completely honest with you?

A. No.

Q.   And when she told you the story about going through the bed and it didn't really hurt her at first, did you believe that?

A.   Oh, yeah, I did, yeah.

Q.   And pretty consistent the description of the accident with what complaints she was having; correct?

A.   That's correct, yeah.

Several physicians relayed opinions regarding Crooks' back pain. First, Dr. Shamieh testified to the following regarding his impression of Crooks and the causation of her lower back pain:

Q.   So, is it your opinion, Dr. Shamieh, knowing her history as long as you have, seeing her for the year or so before this accident that this fall through the sofa bed caused her either an exacerbation of a pre-existing condition, new injury, or even possibly both, probably both?

A.   Yeah, most likely in my opinion that she had the pre-existing condition. This one exacerbated her problem. I cannot really be sure more than that, but most likely it exacerbated her problem.

Q.   You can't be a hundred percent sure, but within a reasonable medical certainty that is, more probably than not, the fall through the sofa bed caused her to become symptomatic with the radiculopathy?

A.   That's correct, yeah.

Q.   It caused her to have more pain in her back?

A.   That's correct, yeah.

Next, Dr. Anil Nanda, a neurosurgeon, saw Crooks regarding her back pain. Dr. Nanda testified to the following regarding his impression of Crooks and the causation of her lower back pain:

Q.   And if, in fact, Ms. Crooks will testify, and I want you to assume that she will testify that while she had some problems prior to the accident, that the accident aggravated that condition to a great degree, and that she suffered increased pain and problems following the accident . . . Assuming that to be true, wouldn't you agree that this accident, that it's more probable than not, caused an aggravation to her back condition?

A.   Based on her veracity, yes.

. . . .

Q. And if, in fact, there was no thought on her part of having surgery prior to this accident and that she had not consulted for a surgical consult prior to the accident, wouldn't you agree that more likely than not her condition which then caused her to come see you was related to the fall?

A. Yes.

Additionally, Dr. Frank Lopez, a specialist in pain management, testified to the following regarding his impression of Crooks and the causation of her lower back pain:

Q. And when you put the finding together that you had on that very first visit, can you tell us what your clinical impression was?

A. If you're asking as to causation in regards to what she is complaining of, she's telling me that she has back pain, that she had a recent fall, that she had back problems in the past but those, from my understanding, had been being minimized. So, my findings in the clinical examination correspond to the complaints she had. So, it was then my impression that she sustained a fall which made her have this pain of the complaints and the physical examination corresponds to those complaints.

. . . .

Q. And so, in fact, if she had some low back pain before the fall but no radiating pain, let's say for the year and a half or so before the fall, if she has some back pain at the time of the fall but immediately after the fall it begins to get worse, and then she has the radiating pain that you've talked about and has been diagnosed in all the test, that would be something that either is a new injury or an exacerbation to a pre-existing condition; correct?

A. Yes.

Q. And it's your opinion, you've already told us, whether it's a new injury or it's an old problem that she had, it was either made worse or made symptomatic by her fall through the sofa bed?

A. That's a good assessment.

Finally, Dr. Clark Gunderson, an orthopedic surgeon, testified to the following regarding his impression of Crooks and the causation of her lower back pain:

13

Q.  And based on your review of the testing, did you come up with a diagnosis for Judy?

A.  I did.

Q.  And what was the diagnosis?

A.  I believe she had some spondylolisthesis at L5-S1 and degenerative disk at L4-5 which had been rendered symptomatic.

Q.  Rendered symptomatic by this accident?

A.  Yes.

. . . .

Q.  Doctor, we have to ask this. It's kind of a legal way of phrasing it. It's a little big long and drawn out, but I'll try to be as quick as possible. Assume in the essentially 12-month period of time before the fall at Memorial hospital that Judy had only occasional flare-ups with low back pain. Assume that she had no radiculopathy for that period of time, and that after this event at Memorial Hospital she had an onset of severe pain and radiculopathy that lasted all the way until she saw you and beyond up to the point where she had surgery, and assume you didn't have some sort of intervening accident. Is it more probable than not that what you saw her for and the problems that you saw in the objective testing were caused by the fall at Memorial Hospital?

A.  Yes.

. . . .

Q.  And your opinion that Mrs. Crooks' alleged fall at Lake Charles Memorial Hospital rendered this pain symptomatic, the lower back pain with radiation of the legs, isn't it fair to say that it's based on Mrs. Crooks' representation to you that she was asymptomatic before the time of that fall?

A.  Yes.

Given the testimony above, we find that Crooks has carried her burden to prove that the back pain she suffers is casually related to the December 21, 2002 accident. We base this finding on Dr. Shamieh's endorsement of Crooks' character, on Dr. Shamieh's testimony that differentiates the preexisting back pains from the post-accident back pains, and Dr. Shamieh's finding that those post-

14

accident back pains are more probable than not related to the fall through the defective sofa bed.

*Causation – Back Pain and Surgery*:

Several physicians relayed opinions regarding Crooks' back pain and the need for surgeries. They were Drs. Shamieh, Nanda, Lopez, and Gunderson. Dr. Shamieh related Crooks' back pain to the accident.

Dr. Nanda testified to the following regarding his impression of Crooks and the need for surgery:

Q.   And in deciding whether to perform surgery on a patient you look at diagnostic studies as well as a patient's complaints of pain?

A.   Correct.

Q.   In other words, if she had diagnostic studies that showed she had a preexisting spondylolisthesis but she wasn't having complaints of pain, you would not suggest an operation at that time?

A.   Correct.

Q.   And if, in fact, after an accident she has a condition that may have preexisted but the condition became symptomatic to the point that she even sought out a surgeon to see what opinions were available, would you agree that the aggravation to the back condition would contribute to the need for surgery?

A.   Yes.

Q.   And if, in fact, there was no thought on her part of having surgery prior to this accident and that she had not consulted for a surgical consult prior to the accident, wouldn't you agree that more likely than not her condition which then caused her to come see you was related to the fall?

A.   Yes.

On cross-examination, Dr. Nanda testified to the following regarding additional surgeries Crooks may need due to the fall:

Q.   Just hypothetically assuming that Ms. Crooks' first surgery, which you performed, was something that you can relate the need to for the fall, the additional surgery she's going to have are those things that you could also relate to the fall?

15

A.    Yes.

Next, Dr. Lopez, testified to the following regarding the accident and the need for surgery:

Q.    Based on the history that you got about her falling through the sofa bed, is it your opinion that it's more probable than not that the fall through the sofa bed caused her need for surgery?

A.    Probably, yes.

Q.    Okay. Based on your treatment of her until May of this year, do you have an opinion on whether or not it is probable that she may have surgery looming for her in the future?

A.    I don't know that that is in plans for her, but the natural history of back surgeries is that, as the individual ages, more problems occur than in the population that hasn't been injured. So, as to whether she needs another surgery, I don't know that. The possibility of it is certainly much higher than it would be let's say in me.

Q.    So, somebody who has had back surgery is much more likely to have back surgery in the future than somebody who has not had back surgery or a back injury?

A.    Yes.

Additionally, Dr. Shamieh, testified to the following regarding the accident and the need for surgeries:

Q.    Is it your opinion that the accident at Memorial Hospital caused Judy to need the surgery?

A.    Most likely, yeah.

. . . .

Q.    Assuming all the facts that you know and no intervening accident since you saw her before this July of 2010 visit, there is no intervening accident at this point, would your opinion still be the same that the second surgery because of the first surgery would be related to this accident?

A.    I think more probably than not, yes.

16

Finally, Dr. Gunderson, testified to the following regarding the accident and the need for surgeries:

Q.    All right. And is it your opinion, based on the history that was given, that the surgery was required as a result of the accident?

A.    Yes.

      . . . .

Q.    Let me do it this way. If she had an onset of severe low back pain constant over the period of time from the date of the accident until you saw her, that would be a new symptom?

A.    Yes.

Q.    If in fact she had constant complaints of radiating pain into her legs, gradually increasing from after the accident until you saw her, that would be a new symptom?

A.    Yes.

Q.    And so that, those findings, that history, plus the objective tests that you reviewed, those are all the things that were the basis of your opinion that this accident caused the problems that needed surgery?

A.    Yes.

In conclusion, every doctor testified that the injuries she sustained were related to the accident at LCMH. Each doctor testified that their treatment was related to the accident. Additionally, each doctor testified that the accident, more probable than not, caused Mrs. Crooks to undergo surgery. Thus, we find that the fall through the defective sofa bed did cause injury to Crooks' lower back causing her to have surgery.

*Damages – Medical Bills:*

Crooks has submitted, through Plaintiff's Exhibit 8, a list of all medical bills incurred. Crooks has carried her burden to prove that she is entitled to any and all medical bills with the exception of any which were incurred prior to the hospital fall. We reach this conclusion based on the medical testimony in the record.

17

Accordingly, we render judgment, finding that Crooks is entitled to an award of past medical bills in the amount of $115,679.23.

*Damages – Pain and Suffering/Loss of Enjoyment of Life.*

The treating physicians consistently and universally testified that Crooks is a truthful patient whose complaints corresponded to objective medical conclusions. Further, those physicians opined that the objective medical findings were all, more probable than not, caused by the December 21, 2002 accident. These testimonies are not refuted by any testimony in the record.

However, Crooks has a medical history of occasional lower back pain. We note that, under Louisiana law, Crooks is entitled to compensation for aggravation of her preexisting conditions, while no compensation can be made for the existence of those preexisting conditions. This distinction, while subtle, is significant, and we have taken it into account rendering judgment in this case.

While those preexisting conditions were present, Crooks was engaging in a relatively normal life prior to this accident. The record is voluminous and clearly indicates that this lady has suffered and will continue to suffer greatly. She has undergone surgical procedures, and her potential for enjoyment of life is greatly diminished. Accordingly, after a thorough review of the record, we render judgment, finding that Crooks is entitled to a total of $200,000.00 for the aggravation of her preexisting medical conditions, her past, present, and future physical pain and suffering, her past, present, and future mental pain and anguish, and her loss of enjoyments of life, both past and future.

*Damages – Future Medical Expenses*:

Dr. Nanda testified regarding the cost of the surgery Crooks would need to undergo. His is the only evidence in the record regarding the cost of future medical expenses. It follows:

Q. Could you give us an approximation on the cost of that surgery?

A. The cost of Ringling Brothers. I'm just kidding. No, I think it's about $30,000.00 or something with hospital and everything.

This testimony is uncontroverted. Thus, after having considered the doctor's opinions and testimony, we find that Crooks is entitled to an award of $30,000.00 for future medical expenses.

## CONCLUSION:

We find merit in Lake Charles Memorial Hospital's contention that the trial court erroneously granted a directed verdict on the issues of liability, causation, and comparative fault. This finding pretermitted the remaining assignments of error raised by both parties.

Given that the record is complete, after conducting a *de novo* review to adjudicate this matter, we find that Crooks carried her burden to prove that an accident occurred on December 21, 2002, and that LMCH is liable unto her under La.Civ.Code art. 2317.1. Thus, we render judgment awarding Judy Crooks $115,679.23 in medical expenses, $200,000.00 for the aggravation of her preexisting medical conditions, the physical and mental pain and suffering for past, present, and future, and the loss of enjoyment of her life, both past and future, and $30,000.00 for future medical expenses. All costs of these proceedings are assessed to Lake Charles Memorial Hospital.

**REVERSED AND RENDERED.**